BEFORE THE FLATHEAD CONSERVATION DISTRICT BOARD OF SUPERVISORS

| | |
|---|---|
| IN THE MATTER OF THE DECLARATORY RULING  ) | |
| BY THE FLATHEAD CONSERVATION DISTRICT      ) | Findings of Fact, |
| RE: JURISDICTION OVER STRUCTURE BUILT       ) | Conclusions of Law, and Declaratory |
| ON McDONALD CREEK NEAR APGAR,              ) | Ruling |
| MONTANA                                                      ) | |

## FINDINGS OF FACT

### BACKGROUND

At issue in this proceeding is a home being constructed by John and Stacy Ambler (Petitioners) on the bank of McDonald Creek. The property is located within the boundaries of Glacier National Park on a private inholding in Apgar, Montana. After receiving complaints and after an inspection by the Flathead Conservation District (FCD), the construction was found to be in violation of Montana's Natural Streambed and Land Preservation Act of 1975 (Act or 310 law). FCD ordered the home to be removed, the site to be restored, and Petitioners to obtain a permit to do so. Petitioners substantially complied with FCD's cease and desist order but disagree that FCD has jurisdiction and requested a declaratory ruling. FCD found the matter to be of significant public interest and followed the appropriate declaratory ruling process outlined in MCA 75-7-125 to gather information, data, and arguments pertaining to the issue.

The process and facts gathered to support this declaratory ruling are outlined below.

### PROCEDURAL FINDINGS

1. FCD, a duly organized conservation district, is a political subdivision of Montana formed in 1945. It is a public body, corporate and politic, exercising public powers. MCA 76-15-215. In 1948, affected residents voted to expand FCD's boundaries to incorporate all of Flathead County and

Exhibit 2
Page 1 of 22

incorporated cities and towns, including the unincorporated town of Apgar, Montana. Exhibit FCD-132. FCD employees are not county employees.

2.  The Act is codified at MCA 75-7-101, et.seq. The rules implementing the Act are set out in the Administrative Rules of Montana 36.2.401 through 410 and FCD's rules revised in 2019.

3.  FCD is responsible for administering the Act, which includes the responsibility and authority to determine its jurisdiction. FCD has the authority to enter declaratory rulings regarding the applicability, interpretation, and implementation of the Act. MCA 75-7-125.

4.  In January, February, and March 2023, FCD received numerous complaints about a house under construction on the bank of McDonald Creek. Exhibits FCD-7 through FCD-23. FCD notified Petitioners of each complaint filed and gave them 15 days to respond or the matter would be processed and enforced as a violation. Exhibits FCD-24 through FCD-40. Petitioners responded and a site inspection was scheduled for February 27, 2023. Exhibits FCD-41 through FCD-74; Exhibit FCD-82.

5.  On February 27, 2023, a site inspection was conducted. On site were: FCD supervisors Roger Marsonette, Scott Rumsey, and John Ellis; Montana Department of Fish, Wildlife and Parks representative Leo Rosenthal; and Petitioners John and Stacy Ambler. The site inspection team (FCD and Montana Department of Fish, Wildlife and Parks representatives) found a house was under construction on the immediate bank of McDonald Creek and the bank had been excavated to create a pad on which to build the house. The pad area had been stabilized with rock rap on the river side of the channel. The inspection team noted that a violation occurred and recommended: 1) the removal of the house after high water and before November 1, 2023; 2) the streambank be restored to its original slopes and revegetated by November 1, 2023; 3) a 310 permit be obtained prior to removal of the structure and restoration and revegetation of the streambank; and 4) erosion control measures be implemented prior to the work being done. At

2

Exhibit 2
Page 2 of 22

its March 13, 2023, meeting, FCD accepted the inspection team's recommendations and determined a project had been initiated on a perennial stream without a permit and is a violation. FCD notified Petitioners of its decision. Exhibit FCD-5, Exhibit FCD-76, Exhibit-84.

6. On March 20, 2023, Petitioners requested FCD to table any decision regarding the complaints to allow time to conduct an analysis of FCD's jurisdiction and determinations. Exhibit FCD-2, Baker Letter. FCD denied that request. Exhibit FCD-85; Exhibit Saw-3.

7. Petitioners requested a declaratory ruling in a letter dated April 3, 2023. They requested a ruling on a) FCD's determination of jurisdiction; b) FCD's decision to require the removal of the structure, restoration of the bank, and a permit be obtained to do so; and c) FCD's decision to deny additional time to gather, analyze, and present relevant information and scientific data. Petitioners requested FCD first set a hearing regarding jurisdiction and later schedule a second hearing to determine the other disputed items if jurisdiction is found. Exhibit FCD-2. Later, Petitioners filed a request to amend the scheduling order to include items b) and c) above, which was denied. After that, Petitioners submitted a request to FCD to dismiss the matter based on their contention the state does not have jurisdiction, but they did not request the suspension of the declaratory ruling. Petitioners further state their constitutional rights were being affected because they felt they were being treated differently from other persons in violation of the Act and they claim the report submitted in Exhibit Pet-6 shows the structure will not negatively affect the stream function. Exhibit FCD-2, Exhibit Pet-1, Exhibit Pet-4, Exhibit Pet-6, Exhibit Saw-2, Exhibit Saw-4.

8. On April 10, 2023, in accordance with its rules, FCD issued an order to cease and desist all activity in the area. Exhibit FCD-81. FCD rule 18 (3). Petitioners substantially complied with the order but had already ceased construction after they were notified of complaints. Exhibit Pet-9.

3

Exhibit 2
Page 3 of 22

9.  On May 3, 2023, at a special meeting, FCD accepted jurisdiction for the declaratory ruling; determined the declaratory ruling will directly affect others in the McDonald Creek and Flathead River drainage; determined the matter constitutes significant public interest; and appointed Laurie Zeller as hearings officer to preside over the declaratory ruling process.

10. On May 22, 2023, at an FCD board meeting, at which Petitioners' attorney was present, a scheduling order was discussed to establish the process for interested persons to submit information, review and rebut information submitted, and participate in a public hearing to present views and additional information. A public hearing was scheduled for August 25, 2023, to allow for information submittal and to allow time for Petitioners' expert to attend the hearing. Further, FCD discussed the two questions being posed to FCD regarding jurisdiction. The first question was whether state law applies to private property within the boundary of Glacier National Park. The second question was whether Petitioners' house is a project requiring a permit under 75-7-101 et.seq and FCD rules. FCD agreed to move forward with the scheduling order but stipulated that the issue of federal jurisdiction versus state jurisdiction would likely be considered outside of this declaratory ruling process. It was determined, in the interest of time, the declaratory ruling process on FCD jurisdiction would move forward until a decision was made by the National Park Service or the Attorney General's Office. Exhibit FCD-5, Scheduling Order; Exhibit FCD-96. Both questions were considered.

11. Public notices were provided on June 6, 2023, July 6, 2023, and August 21, 2023. Written comments were accepted by June 20, 2023, and rebuttal comments were accepted until July 20, 2023. All information gathered was available at FCD's office, at the ImagineIF Library in Kalispell, Montana, and on line at https://flatheadcd.org/310-stream-permits/declaratory-ruling-mcdonald-creek-violation/. Exhibit FCD-5, Scheduling Order, Exhibits FCD-99, FCD-126.

4

Exhibit 2
Page 4 of 22

12. A public hearing was held August 25, 2023, at 9:00 a.m. at the Hilton Garden Inn in Kalispell, Montana. Written and oral presentations were accepted at the public hearing. Exhibit FCD-5, FCD-131, Public hearing transcript.

## STATE VERSUS FEDERAL JURISDICTION

13. The property in question is a private in-holding that has remained in private ownership since 1908 in Flathead County, State of Montana. The property is located within the boundaries of Glacier National Park but has never been purchased by the federal government. Exhibit Jun-2.

14. FCD has the authority to determine its jurisdiction under the Act with the authority to "determine the applicability, interpretation, or implementation of any statutory provision or any rule.". MCA 75-7-125(1)(a) (emphasis added); The Montana Supreme Court has affirmed this principle in multiple cases. *Bitterroot River Protection Association v. Bitterroot Conservation District*, 2002 MT 66, ¶ 15, 309 Mont 207,45 p.3d 24. *Stalowy v. Flathead Conservation District*, 2020 MT 155,¶ 465 P.3d 1170.

15. Montana's Constitution, Article II, Part II, Section 3 states: "All persons are born free and have certain inalienable rights. They include the right to a clean and healthful environment and the rights of pursuing life's basic necessities, enjoying and defending their lives and liberties, acquiring, possessing, and protecting property, and seeking their safety, health and happiness in all lawful ways. In enjoying these rights, all persons recognize corresponding responsibilities."

16. Montana's Constitution, Article IX, Environment and Natural Resources, Section 1 states: (1) The state and each person shall maintain and improve a clean and healthful environment in Montana for present and future generations. (2) The legislature shall provide for the administration and enforcement of this duty. (3) The legislature shall provide adequate remedies for the protection

Exhibit 2
Page 5 of 22

of the environmental life support system from degradation and provide adequate remedies to prevent unreasonable depletion and degradation of natural resources.

17. The intent of the Act is to implement the requirements of Montana's Constitution. MCA 75-7-102 (1) states, "The legislature, mindful of its constitutional obligations under Article II, section 3, and Article IX of the Montana constitution, has enacted The Natural Streambed and Land Preservation Act of 1975. It is the legislature's intent that the requirements of this part provide adequate remedies for the protection of the environmental life support system from degradation and provide adequate remedies to prevent unreasonable depletion and degradation of natural resources."

18. The policy of the Act is in keeping with the intent.  MCA 75-7-102 (2). It states, "It is the policy of the state of Montana that its natural rivers and streams and the lands and property immediately adjacent to them within the state are to be protected and preserved to be available in their natural or existing state and to prohibit unauthorized projects and, in so doing, to keep soil erosion and sedimentation to a minimum, except as may be necessary and appropriate after due consideration of all factors involved. Further, it is the policy of this state to recognize the needs of irrigation and agricultural use of the rivers and streams of the state of Montana and to protect the use of water for any useful or beneficial purpose as guaranteed by The Constitution of the State of Montana."

19. The Act is consistent with the purpose of Glacier National Park, which is to "conserve the scenery, natural and historic objects, and wildlife in the system units and to provide for the enjoyment of the scenery, natural and historic objects, and wildlife in such manner and by such means as will leave them unimpaired for the enjoyment of future generations." 54 US Code 100101(a). Exhibit Saw-4.

6

Exhibit 2
Page 6 of 22

20. After purchasing the property, Petitioners state they were told by county staff that Flathead County had *no jurisdiction on private land in Glacier National Park*. Exhibit FCD-41. However, on March 13, 2019, Petitioners sent an e-mail to the county inquiring about setback requirements for a small cabin in West Glacier. On May 13, 2019, a county staff member e-mailed back and said the property in question was in Apgar and that because it was *unzoned* (not because the property was private land in Glacier National Park), Flathead County did not regulate it. The County further stated because it was unzoned, no setbacks apply, and they could do what they want with the land without restriction. Exhibits FCD-42, MCC-4.

21. Petitioners contend the US Government has exclusive jurisdiction over private property within Glacier National Park. Exhibits Pet-4, Pet-10, Pet-13, FCD-131, page 6-21, lines 115-448, Baker.

22. Petitioners' position is Montana ceded jurisdiction when Glacier National Park was formed in 1910, under the MCA §2-1-205, which states: "Exclusive jurisdiction shall be and the same is hereby ceded to the United States over and within all the territory which is now or may hereafter be included in that tract of land in the state of Montana set aside by the act of congress, approved May 11, 1910, for the purposes of a national park, and known and designated as "The Glacier national park", saving, however, to the said state the right to serve civil or criminal process within the limits of the aforesaid park in any suits or prosecution for or on account of rights acquired, obligations incurred, or crimes committed in said state but outside of said park; and saving, further, to the state the right to tax persons and corporations, their franchises and property on the lands included in said park; provided, however, that jurisdiction shall not vest until the United States, through the proper officers, notifies the governor of this state that it assumes police or military jurisdiction over said park." Exhibits Pet-10, FCD-131, Transcript, page 7, line 141 through page 9, line 181, Baker.

Exhibit 2
Page 7 of 22

23. Petitioners cite several cases to support their argument, notably these cases: a 1930 case, *United States v. Unzueta*, 281 U.S. 138, 142, in which a murder takes place on a right of way on a military reservation; a 1929 case, *Arlington Hotel Company v. Fant*, U.S. 439, 445, in which the hotel operating under a lease by the government was destroyed by fire and hotel guests property was destroyed; a 1929 case, *Yellowstone Park Transportation Company v. Gallatin County*, 31 F.2d 644 (9th circuit), in which Gallatin County was denied taxing authority in Yellowstone National Park; and a 1951 case, *United States v. Peterson*, 91 F. Supp. 209, 213 (S.D. al. 195), in which the state was interfering with the U.S. liquor permitting decision on a business in a private inholding in Kings Canyon National Park. Those cases were all decided using the state's cession statutes. Exhibits Pet-10, FCD-131, Transcript, page 9, lines 183 through page 13, line 267, Baker.

24. Even though Petitioners contend that the federal government has exclusive jurisdiction, the National Park Service has not asserted jurisdiction. Petitioners stated they had numerous conversations with the National Park Service about required permits and were told they needed none. Exhibits FCD-2, FCD-41, FCD-42, FCD-43.

25. Federal Code establishing Glacier National Park 16 USC §161 describes the legal description of the tract of land in the State of Montana to be included in the park was "dedicated and set apart as a public park or pleasure ground for the benefit and enjoyment of the people of the United States." The statute also states that "Nothing herein contained shall affect any valid claim, location, or entry existing under the land laws of the United States before May 11, 1910, or the rights of any such claimant, locator, or entryman to the full use and enjoyment of his land." Petitioners' property was a valid claim existing before 1910. This language undermines Petitioner's contention Glacier National Park has exclusive jurisdiction over private property

8

Exhibit 2
Page 8 of 22

because the private property rights were reserved and not definitively ceded in the 1910 Act. Exhibits Saw-4, Saw-6.

26. The National Park Service was aware of Petitioners' plan to build a cabin and did not assert jurisdiction over private property. In an e-mail sent to Petitioners dated December 8, 2021, regarding power installation, the National Park Service states "as long as the temporary power pole is on private property, the Park is not involved. Just make sure it is on your property." Further, the National Park Service states there is no application or permit to connect to the water and sewer system, but the National Park Service must be called out to inspect the connection before it is backfilled. National Park Service provided guidelines for connection and the process for setting up payment for service. Email submitted by Petitioner dated September 19, 2023.

27. While some uncertainty as to which laws and regulations might apply to a private inholding within a national park is understandable, the conclusion that the property is unregulated and requires no permits is contrary to all public policy – federal or state. The Act and the purpose of Glacier National Park are not inconsistent or in conflict with any federal action. Federal laws in national parks do not preempt state regulation except for "pervasive reasons" such as showing that compliance with both is a physical impossibility or where Congress evidences a clear intent to preempt state control. Florida Avocado Growers v. Paul, 373 US 132, 142 (1963). State law will fall only where it stands as an obstacle to the "accomplishment and execution of the full purposes and objectives of Congress." Perez v. Campbell, 402 US 637, 639 (1971). Exhibits Saw-4, Saw-6.

28. United States v. Peterson concluded the United States had exclusive police jurisdiction over privately owned land because it was necessary in order to secure the benefits intended to be derived from the park. Petersen at 213. The Act and FCD's jurisdiction do not interfere with the

Exhibit 2
Page 9 of 22

benefits derived from Glacier National Park, rather it is necessary to minimize impacts from a person's unauthorized projects on natural perennial-flowing streams. Exhibit Saw-6.

29. On August 3, Bryan Wilson, Acting Solicitor General, US Department of Interior sent an e-mail to FCD attorney Camisha Sawtelle and Petitioner attorney Trent Baker. It stated, "at this point, the Department will not assert a position or insert itself into the ongoing Flathead Conservation District proceeding. Exhibit FCD-125, page 19.

30. On September 6, 2023, Montana Attorney General's office sent a letter stating "Please be advised that we are unable to offer either a letter of advice or an Attorney General Opinion in response to your request concerning State Jurisdiction in Private Inholding in Glacier National Park" because the "issue appears to be presently or imminently in administrative proceedings, litigation, or involves factual disputes, and therefore we decline to issue an Attorney General Opinion on this matter." Exhibit FCD-134.

31. The FCD has relied on Montana AG Opinions 1977 (Volume 37, Opinion 15) and 1980 (Volume 38, Opinion 34) and has asserted jurisdiction for private projects on federal land, including Glacier National Park since 1976. Exhibits FCD-104 through FCD-114, Jun-4 (1977 AG opinion); FCD-77 (Sawtelle March 9, 2023, e-mail); Pet-10.

**FCD JURISDICTION**

**McDonald Creek Facts**

32. McDonald Creek originates on the southern end of Lake McDonald and flows southerly for a few miles until it flows into the Middle Fork of the Flathead River which is designated as a Wild and Scenic River. Exhibits Fry-2, MCC-2. It is not disputed that McDonald Creek is a natural perennial-flowing stream.

33. Mike Sanctuary, a hydrologist from Confluence Consulting, was hired by Petitioners to provide a report with hydrologic, hydraulic, and geomorphic information related to Petitioners' homesite.

Exhibit 2
Page 10 of 22

The report's stated purpose is to provide unbiased information to better inform the jurisdictional status of the property with respect to the Act, the basis for a 310 violation, and justification for subsequent penalties issued by FCD. Exhibit Pet-6.

34. Apgar Creek enters McDonald Creek a short distance from Lake McDonald and creates a gravel bar across from Petitioners' property pushing McDonald Creek's flow eastward toward Petitioners' property. Exhibits Pet-6, FCD-101 (aerial photo). This is approximately where McDonald Creek can be said to begin. Exhibit FCD-131, page 37, line 791-803, Sanctuary.

35. McDonald Creek banks are made up of gravel, sand, and silt with an average cobble size of 1 inch which are easily moved by foot traffic. Vegetation on the bank in front of Petitioners' house consists of a variety of grasses, which are breaking off and slumping into the creek. Further up the bank on adjacent property on either side of Petitioners' house, shrubs, evergreen, and deciduous species are present. Upstream, downstream, and adjacent to the home, the bank exhibits signs of instability including an intermittently vegetated bank line. Gravel deposits in front of Apgar Creek are moved by McDonald Creek flows, which may contribute to the bank's configuration. However, the site is heavily used by pedestrians to hike, swim, and fish -- enough to create a trail that causes loss of vegetation, erosion and slumping of grass mats into the river. Exhibits Pet-6, FCD-41, Pet-6 (Photos), FCD-131, page 34, line 746, page 35, line 748 – 749, Sanctuary. Wildlife also use the trail. Exhibit FCD-131, page 60, line 1310-1319, Williams, a naturalist in the park for 31 years.

36. Confluence collected several survey points around Petitioners' property, through the retaining wall, and along the bank line as a basis for the hydrologic, hydraulic, and geomorphic effect of the homesite and retaining wall. Exhibits Pet-6, FCD-131, page 25, line 543-549, Sanctuary. Confluence superimposed the retaining wall and house as surveyed onto digitized aerial photos and used the photos and drawings to:

Exhibit 2
Page 11 of 22

1. Show survey data for an overall site plan and profile for surface elevation for 2-year flood and 100-year flood events. The 2-year flood elevation was shown below the retaining wall about 9.4 to 12 feet away from the creek. The estimated 100-year flood elevation falls at the base of the retaining wall on the northern end, and slightly above the base of the retaining wall on the southern end. Exhibits Pet-6, FCD-131, page 44, line 946-947, Sanctuary.

2. Indicate bank line locations to determine McDonald Creek movement. The analysis showed little bank line change between 1990 and 2023.

3. Establish the surface elevation of McDonald Creek in relation to the house and retaining wall. These cross sections depict two water surface elevations with respect to the bank, house, and retaining wall. Exhibits Pet-6, FCD 131, page 29, lines 618 through 633, page 31, lines 688-692, page 32, line 691-692, page 33, lines 717-719, Sanctuary.

37. The two cross sections were approximately 40-50 feet apart.  XS-1 was taken at the northern, or upstream edge of the property; XS-2 was taken at the southern edge, or downstream edge of the property and runs through the retaining wall below the house. Exhibits Pet-6, FCD-131, Transcript page28, line 610 through 613, and page 29, line 626, Sanctuary. No flow data exists for McDonald Creek, but nearby gauge data was used from the Middle Fork of the Flathead River. FCD-121, Transcript, page 31, line 678 through 682, Sanctuary. The following table shows the results of the survey and flow calculations. Exhibit Pet-6. Original elevations of the bank are not documented as the survey was conducted post construction.

| Station and Flood Event | Estimated CFS | Estimated Depth | Estimated Surface Flow Elevation |
|---|---|---|---|
| XS-1 -- 2-year Flood | 2,070 | 3.32 | 3,155.36 |
| XS-1 -- 100-year Flood | 13,500 | 6.87 | 3,158.36 |
| XS-2 -- 2-year Flood | 2070 | 3.05 | 3,155.10 |
| XS 2 – 100-year Flood | 13,500 | 7.28 | 3,159.33 |

Exhibit 2
Page 12 of 22

38. Peak flow parameters were obtained through StreamStats, a USGS program, and using standard protocols. Peak flow was reasonably reconciled by observations and a survey conducted at the site. The 2-year flood was calculated based on a low flow of 576 and a high flow of 7440, with a probability of accuracy of 88.9 percent. The 100-year flow of 13,500 cfs was calculated based on a low flow of 11,500 cfs to a high flow of 15,900 cfs, with a probability of accuracy of 13.6 percent. Exhibits Pet-6, FCD-131, Transcript, Mike Sanctuary regarding the meaning of the margin of the standard of error noted in the report.

39. The 2-year flood and the 100-year flood have been reasonably determined. However, the report's author states flood elevations can vary widely and "it is not something you want to hang your hat on," "it's not perfect, but it is a pretty good indicator." Exhibit FCD-131, Transcript, page 41, lines 890 to 897, page 29, line 627, Sanctuary.

40. The report concluded the building footprint, extent of adjacent retaining wall, and building pad indicates no ground at or below the ordinary highwater mark or McDonald Creek has been disturbed or excavated during construction of the house. Exhibit Pet-6. This conclusion does not take into consideration the depth of the footings, which is unknown. Exhibit FCD-131, page 39, lines 843 – 846, Sanctuary. Regardless of where the ordinary highwater mark is, FCD's jurisdictional limits are inclusive of the immediate banks defined as "the area above the mean highwater mark and directly adjacent to a stream which when disturbed will physically alter or modify the state of a stream in contravention of MCA 75-7-102." Exhibit FCD- 6; ARM 36.2.402(5). The report did not directly address the impact of the structure on the immediate banks of McDonald Creek.

41. Climate change and melting glaciers affect how fast water enters the system and should be considered as part of the flood model. Less ice and snow fields and more exposed rock will shed water more quickly. Climate change effects on McDonald Creek are unknown, potentially making

Exhibit 2
Page 13 of 22

a house so close to the bank risky in the future. It is unknown if the standard protocol takes this into consideration. FCD-131, page 57-58, line 1241-1272, Dean Sirucek, Forest Service soil scientist and hydrologist, 35 years' experience with 12 years in the area in question.

42. According to a USDA staff report dated July 24, 2023, most of Flathead County is in a severe drought category. Exhibit FCD-128.

43. McDonald Creek experienced record flooding in 1964. Monica Jungster, who has lived 400 feet from Petitioners' property since the 1960's, remembers the flood. She watched as McDonald Creek flowed backward into McDonald Lake. Large sections of the east bank of McDonald Creek were eroded away, destroying houses along the east bank near Petitioners' property. Historical photos in the record show eroded banks and houses hanging over the edge. One cabin fell into the river and floated downstream, getting caught on Camas Road bridge with other debris. The .05 acres Petitioners now own is all that is left of the private lot near where one of the houses was left hanging off the bank. Trees still fall into McDonald Creek from the east bank and an open cut close to Camas bridge still exists. Exhibits FCD-92 (flood photos), Jun-2, Monica Jungster, Lun-2; Exhibit FCD-131, page 50, lines 1088 through 1094, Jungster. "The power of the natural flow of water and what happens quickly to streambeds and riverbeds was never more evident than during that time." Exhibit Lun-2. Mike Sanctuary, the Petitioners' consultant stated, "This type of flood is extremely rare and while it can happen at any time, the likelihood is low. These are not the floods to which agencies should be regulating." Exhibit FCD-131, page 71, line 1538-1545, Sanctuary. No information was provided about effect of flood flow to adjacent property as a result of the placement of the house, pad, or retaining wall. Other floods have been noted in the record that affected Upper McDonald Creek and other waterways, but nothing in the records suggests those floods substantially affected the bank of Lower McDonald Creek. Exhibits Pet-6, Jun-2, FCD-131, page 52, lines 1134-1135, Jungster.

14

Exhibit 2
Page 14 of 22

44. Gauge data on the Middle Fork of the Flathead River shows that 1964 was the largest flood of record (since 1940). Since 1990, the peak flow has exceeded the 2-year discharge 16 times or roughly 48.5 percent of the years. Exhibit Pet-11. Claudette Byrd-Rinck, a resident of West Glacier, stated she has observed high water above where Petitioners' house pilings are located which happens every few years. Exhibit FCD-23.

**House and Site Facts**

45. In 2019, Petitioners purchased a 2309 square foot right-angle triangular shaped creek front lot in Apgar, Montana, measuring 52 feet on the southern downstream edge, 89.01 on the western edge facing the creek, and 103.48 feet on the northern edge of the property. The lot is a private inholding within the boundaries of Glacier National Park, located on the east side of McDonald Creek, not far from where McDonald Creek exits Lake McDonald. The lot is described as Section 23, Township 32, Range 19, Flathead County, Montana, 17376-10, TR 2EBCA in L3. Exhibits FCD-5, FCD-7, Pet-9. The property is part of the original land grant patented under the homestead act in 1908 to Milo B. Apgar and part of the land granted to Charles Howe. The land has remained privately owned since that date. Exhibit Jun-4.

46. Photos of the site preconstruction show a vegetated lot with a variety of trees and vegetation on the bank sloping toward McDonald Creek. Exhibit FCD-101. Most of the trees and vegetation were removed to accommodate the construction of the house. Exhibits FCD-8, FCD-11, FCD-13, FCD 37, FCD 101, FCD-102 (photos); Exhibit Pet-9. Seven other creek-front lots are located downstream of Petitioners' house. The streamside boundary of those lots lines up with Petitioners' property. Exhibit FCD-20.

47. The 2,178 square foot house has three levels with two overhanging decks. It is built into a bank that slopes toward McDonald Creek. A pad surrounded by a retaining wall elevates the house 3.5

Exhibit 2
Page 15 of 22

to 4 feet above the creek. The house has no garage or adequate space for outside parking.
Exhibit Pet-9; Exhibits FCD-11, FCD-35, FCD-37, FCD -76, FCD-102, Jun-5 (photos); Exhibit MCC-6.

48. The immediate bank was re-graded and a four-foot retaining wall was constructed using 90 yards of backfill material from the excavated bank to elevate and construct the house. Boulders approximately 2.5 feet in diameter have been placed around the elevated pad. Exhibits Pet-6, Pet-9. The fill material was placed beyond the original extent of the embankment to construct the pad. Exhibit Pet-9. Photos show the retaining wall and pad elevating the house above the adjacent lower sloping banks and shoreline of McDonald Creek. Exhibits FCD-11, FCD-35, FCD-37, FCD-41, FCD-76, FCD-102, Photos. The banks on the northern and southern side of the house slope at an approximate 25 to 35 percent grade toward McDonald Creek. Exhibit FCD-102, photos; Exhibits Pet-6, FCD-98.

49. Petitioners' house, over hanging decks, roofline and retaining wall are within inches of the property boundary. A site map in Exhibit Pet-9 shows the footprint of the house is situated within 12 inches from the southern boundary, 12 inches from three points of the northern boundary, and 8.5 feet from the western boundary closest to McDonald Creek. However, these measurements do not include the decks, roof line, or retaining wall. Exhibits Pet-6, FCD-7, FCD-76, photos; FCD-98. The lower porch extends 7 feet from the outside wall of the house to the support pillars for the middle floor deck. The top floor deck and roof extend beyond the middle floor deck. Exhibits FCD-7, FCD-76, Photos; FCD-98; Pet-6, Drawings; Exhibit Pet-9. Drawings resulting from the survey conducted by Confluence as a basis for the hydraulic, hydrologic, and geomorphic analysis show the southern boundary of the retaining wall with respect to Petitioners' house and property. Confluence's superimposed building location on digitized photos shows the end of the retaining wall outside Petitioners' boundary. Exhibit Pet-6.

Exhibit 2
Page 16 of 22

50. The structure is built into a bank sloping toward McDonald Creek and the roof slopes toward the already unstable bank of McDonald Creek. Exhibits FCD-22, FCD-39, FCD-41, FCD-76, FCD-102; Pet-6, Photos; Pet-6, Pet-6 (Photos), FCD-131, page 34, line 746, page 35, line 748 – 749, Sanctuary.

51. No other alternatives for this project were considered. Exhibit Pet-9.

**POTENTIAL IMPACTS**

52. Buildings represent concentrations of human activities. Such activities are essentially land based with people entering the aquatic environment only for relatively short periods of time for recreational purposes. Buildings are potentially harmful through the creation of impervious surfaces, increasing surface storm runoff into the stream and possible sewer leakage. FCD recommends a 20-foot set back to minimize impacts to waterways. Exhibit FCD-98.

53. A wide range of concerns were raised by the public about the effect of the house on McDonald Creek. Prior to construction of a project, the Act, ARM, and FCD rules require certain factors and alternatives be considered to determine if a project minimizes disturbances to a stream. Some of the potential impacts may not fall within the range of factors required to be considered.

   a. Photos of house facing the creek show an unstable bank most likely caused from foot traffic. Petitioners state they would discourage continued trampling of the streambank by pedestrians, which will allow vegetation to heal and stabilize the bank. Exhibit Pet-6, Pet-9. This foot traffic is likely on Glacier National Park property. Access to the creek from the house would be down an approximate 25 or 35 percent grade, creating the potential for erosive trails and increasing the potential for sedimentation. Exhibits FCD-10, FCD-76, FCD-102, Photos; FCD 131, Transcript, page 60, lines 1315-1316, Williams.

Exhibit 2
Page 17 of 22

b. Because of the proximity of the house to McDonald Creek, snow melt and rain runoff from the sloping roof and from rain gutters has the potential to further erode the bank and increase sedimentation or decrease water quality in the creek. Exhibit Jun-2.

c. Potential for garbage or debris from the deck to be blown into the stream and the potential for increasing invasive plants from landscaping. Exhibit Mur-2.

d. The lack of parking may increase erosion and sedimentation, impact water quality, harm vegetation, or cause parking issues for other park visitors. Exhibit MCC-6.

e. Construction debris was evident both on and off Petitioners' property and on the sloping bank of the property. Exhibits FCD-7, FCD-8, FCD 10, FCD-17, FCD-41 photos. No silt fences were evident during construction. Exhibits FCD-23, FCD-76, MCC-2, photos.

f. The site is a premier fishing spot and wildlife corridor, a tributary to a Wild and Scenic River, and the site of habitat events such as the 1964 flood and the 1939-1993 bald eagle concentrations. Exhibits MCC-2, Yat-2. In the past, salmon spawned in the pristine gravels of the creek and eagles captured dying salmon along the clear waters of McDonald Creek. Runoff from the roof flows directly into McDonald Creek, or onto the bank, causing further erosion, potentially harming salmon spawning areas and affecting eagles, grizzly and black bears that have been fishing the spawning salmon that have been observed in the area. Exhibits VBR-2, GBE-2. Salmon spawned directly below the house. Exhibit FCD-23. Degradation of the streambank, streamside vegetation, and water quality is a concern to the future of these wildlife events. Exhibit YAT-2.

g. Due to its proximity to the water, especially during high water, the location impedes hiking along the creek. Exhibit GBE-2.

18

Exhibit 2
Page 18 of 22

h.   The house and retaining wall have the potential to impede natural stream processes

during floods and seasonal high flows due to the position of the elevated pad and

retaining wall so close to the 100-year flood. Exhibits FCD-20, LTE-2.

**CONCLUSIONS**

1.   The Act implements Montanan's right to a clean and healthful environment. Individuals have a

corresponding responsibility to maintain and improve a clean and healthful environment in

Montana for present and future generations. Montana Constitution Article IX, Environment and

Natural Resources, Section 1(1).

2.   It is the policy of the Act that rivers and streams and lands and property immediately adjacent to

them within the state are to be protected and preserved to be available in their natural or

existing state . . . except as may be necessary after all due consideration of all factors involved.

MCA 75-7-102(1). 75-7-102(2).

3.   FCD has the authority to determine its jurisdiction under the Act to further the Act's underlying

principles. This includes the authority to "determine the applicability, interpretation, or

implementation of any statutory provision or any rule." MCA 75-7-125(1)(a) (emphasis added).

The Montana Supreme Court has affirmed this principle in multiple cases. *Bitterroot River

Protection Association v. Bitterroot Conservation District,* 2002 MT 66, ¶ 15, 309 Mont 207,45

p.3d 24. *Stalowy v. Flathead Conservation District*, 2020 MT 155,¶ , 465 P.3d 1170.

4.   The National Park Service declined to assert jurisdiction or take a position on regulation of the

stream and the construction of the home leaving a regulatory vacuum. The record reflects that

the National Park Service does not regulate construction on private property. The property is

within the boundaries of Glacier National Park and has never been purchased or regulated by

the National Park Service. The property is neither park land nor does it meet the purpose of

19

Exhibit 2
Page 19 of 22

Glacier National Park. The question of private inholdings being fully ceded to federal regulation is thus an open question.

5. Petitioners are private citizens acting on their own behalf on private property in Apgar, an incorporated town in Montana and within the boundaries of FCD. Actions by Petitioners were neither undertaken on behalf of nor by documented approval of Glacier National Park.

6. Petitioners are a person as defined in the Act as "any individual, corporation, firm, partnership, association, or other legal entity not included with MCA 87-5-502." MCA-75-7-103(4).

7. McDonald Creek is a natural perennial-flowing stream. 75-7-103(6).

8. The home was built on the immediate banks of McDonald Creek. Immediate banks means "the area above the mean high water mark and directly adjacent to a stream which when disturbed will physically alter or modify the state of a stream in contravention of the policy of the Act." ARM 36.2.402(5).

9. The home is a project defined as "a physical alteration or modification that results in the change in the state of a natural, perennial-flowing stream or river, its bed, or its immediate banks." 75-7-103(5)(a).

10. The home is a permanent change to the state of McDonald Creek.

11. To consider a proposed project, FCD must determine the purpose of a project and whether the project is a reasonable means of accomplishing the proposed project considering all factors involved. MCA 75-7-112. No written notice of a proposed project prior to construction was provided to FCD as required under the Act.

12. Given the proximity of the structure to the boundary line and to McDonald Creek, some of the potential impacts will occur off property. Potential mitigation of those impacts will be borne by adjacent landowners.

20

Exhibit 2
Page 20 of 22

13. MCA 75-7-122, Public Nuisance, states: "Except as an emergency action, a project engaged in by any person without prior approval or activities performed outside the scope of written consent of the supervisors as prescribed in this chapter, is declared a public nuisance and subject to proceedings for immediate abatement."

14. 36 CFR § 5.13 states: "The creation or maintenance of a nuisance upon the federally owned lands of a park area or upon any private lands within a park area under the exclusive legislative jurisdiction of the United States is prohibited."

15. MCA 75-7-123, Penalties – Restoration, states: "(1) a person who initiates a project without written consent of the supervisors . . . is: (a) guilty of a misdemeanor and upon conviction shall be punished by a fine not to exceed $500; or (b) subject to a civil penalty not to exceed $500 for each day that the person continues to be in violation. It also states: (3) In addition to a civil penalty under subsection (1), the person: (a) shall restore, at the discretion of the court, the damaged stream, as recommended by the supervisors, to as near its prior condition as possible; or (b) is civilly liable for the amount necessary to restore the stream."

16. While the report submitted by Petitioners looked at hydraulic, hydrologic, and geomorphic conditions, the consultant did not fully identify or analyze potential impacts in accordance with the Act or any other law. Given the nature of the Act, and policy and implementing rules, the Act cannot be given an unreasonably narrow construction because water is a state resource. *BRPA II* at ¶ 40; *City of Livingston v. Park Conservation District*, 371 Mont. 303, ¶ 13, P.3d 317. *Stalowy* ¶ 22.

17. No federal jurisdiction has been asserted and no notice by the federal government that the Act interferes with the federal policies, goals, or operations has been provided to FCD.

18. Due notice and process were given in this matter.

Exhibit 2
Page 21 of 22

**DECLARATORY RULING**

Based upon the review and analysis of the totality of circumstances presented in the entire record, IT IS
HEREBY DETERMINED:

1. FCD has the authority to determine its jurisdiction and has the responsibility to administer the
   Act on projects undertaken by private parties.

2. The home, decks, roof line, and retaining wall are within the immediate banks of McDonald
   Creek and is a physical alteration or modification that resulted in a change in the state of a
   natural, perennial-flowing stream or river, its bed, or its immediate banks. MCA 75-7-103(6),
   ARM 36.2.402(5).

3. Given the intent and policy of the Act, given the federal government has neither regulated the
   structure nor indicated the Act interferes with the purpose, policy, and goals of the park, and
   given the totality of information in the record and a reasonable reconciliation of the information,
   the record supports a determination FCD has jurisdiction over Petitioners' structure on
   McDonald Creek.

"We will not likely lose our exceptional water quality in the Flathead system all at once. We will lose it in
increments." Exhibit Yat-2. This incremental loss is what the natural streambed and preservation act was
created to minimize, one project at a time.

Approved and adopted by the FCD board of supervisors on November 13, 2023.

Pete C. Woll

Pete Woll, Chair
Flathead Conservation District

Exhibit 2
Page 22 of 22