EXHIBIT
FCD-120

| Revised: 6/5/15 (310 form 270). Form may be downloaded from: www.dnrc.mt.gov/licenses-and-permits/stream-permitting | AGENCY USE ONLY: Application # _____   Date Received _____  Date Accepted ____ / Initials ____  Date ____ |
|---|---|

*This space is for all Department of Transportation and SPA 124 permits (government projects).*
Project Name _____
Control Number _____
MEPA/NEPA Compliance  ☐ Yes    Contract letting date _____
☐ No   If yes, #14 of this application

FL2019005   2019
LO Name: GNP
Stream: Unnamed
S11T33R18Topog: Mt Canon
/Camas Ridge E.  Supervisor/s: RB

# JOINT APPLICATION FOR PROPOSED WORK IN MONTANA'S STREAMS, WETLANDS, FLOODPLAINS, AND OTHER WATER BODIES

Use this form to apply for one or all local, state, or federal permits listed below. The applicant is the responsible party for the project and the point of contact unless otherwise designated. "Information for Applicant" includes agency contacts and instructions for completing this application. To avoid delays, submit all required information, including a project site map and drawings. Incomplete applications will result in the delay of the application process. Other laws may apply.

**The applicant is responsible for obtaining all necessary permits and landowner permission before beginning work.**

| ✓ | PERMIT | AGENCY | FEE |
|---|---|---|---|
| ✓ | 310 Permit | Local Conservation District | No fee |
|  | SPA 124 Permit | Department of Fish, Wildlife and Parks | No fee |
|  | Floodplain Permit | Local Floodplain Administrator | Varies by city/county ($25 - $500+) |
|  | Section 404 Permit, Section 10 Permit | U. S. Army Corps of Engineers | Varies ($0 - $100) |
|  | 318 Authorization 401 Certification | Department of Environmental Quality | $250 (318); $400 - $20,000 (401) |
|  | Navigable Rivers Land Use License, Lease, or Easement | Department of Natural Resources and Conservation, Trust Lands Management Division | $50, plus additional fee |

## A. APPLICANT INFORMATION

NAME OF APPLICANT (person responsible for project): Flathead Electric Cooperative (David Preble)
Has the landowner consented to this project?   ■ Yes   ☐ No
Mailing Address: 2510 US Hwy 2 East
Physical Address: _____
Day Phone: 406-751-4466   Evening Phone: 406-253-9514   E-Mail: d.preble@flathead.coop

NAME OF LANDOWNER (if different from applicant): Glacier National Park
Mailing Address: PO Box 128, West Glacier MT 59936
Physical Address: 64 Grinnell Drive, West Glacier MT 59936
Day Phone: 406-888-7800   Evening Phone: _____   E-Mail: _____

NAME OF CONTRACTOR/AGENT (if one is used): Rocky Mountain Contractors Inc.
Mailing Address: 2214 US Hwy 2 E, Kalispell MT
Physical Address: _____
Day Phone: 406-752-4277   Evening Phone: _____   E-Mail: _____

## B. PROJECT SITE INFORMATION

NAME OF STREAM or WATER BODY at project location No Name   Nearest Town West Glacier
Address/Location: 599 North McDonald Lake Road   Geocode (if available): _____
NE 1/4 SE 1/4 NW 1/4, Section 11 , Township 33N , Range 18W   County Flathead
Longitude 113.877 , Latitude 48.641

The state owns the beds of certain state navigable waterways. Is this a state navigable waterway? Yes or No. If yes, send copy of this application to appropriate DNRC land office – see Information for Applicant.

RECEIVED
FEB 0 1 2019
copies sent to reg FWP 2/4/19
Flail

Exhibit 5
Page 1 of 40

**ATTACH A PROJECT SITE MAP OR A SKETCH** that includes: 1) the water body where the project will take place, roads, tributaries, landmarks; 2) a circled "X" representing the exact project location. IF NOT CLEARLY STATED ON THE MAP OR SKETCH, **PROVIDE WRITTEN DIRECTIONS TO THE SITE.**

## C. PROJECT INFORMATION

1. **TYPE OF PROJECT** (check all that apply)

☐ Bridge/Culvert/Ford Construction
☐ Bridge/Culvert/Ford Removal
☐ Road Construction/Maintenance
☐ Bank Stabilization/Alteration
☐ Flood Protection
☐ Channel Alteration
☐ Irrigation Structure
☐ Water Well/Cistern
☐ Excavation/Pit

☐ Fish Habitat
☐ Recreation (docks, marinas, etc.)
☐ New Residential Structure
☐ Manufactured Home
☐ Improvement to Existing Structure
☐ Commercial Structure
☐ Wetland Alteration
☐ Temporary Construction Access
☐ Other _____

☐ Mining
☐ Dredging
☐ Core Drill
☐ Placement of Fill
☐ Diversion Dam
☒ Utilities
☐ Pond
☐ Debris Removal

2. **PLAN OR DRAWING** of the proposed project **MUST** be attached. **This plan or drawing must include:**

   • a plan view (looking at the project from above)
   • dimensions of the project (height, width, depth in feet)
   • location of storage or stockpile materials
   • drainage facilities
   • an arrow indicating north

   • a cross section or profile view
   • an elevation view
   • dimensions and location of fill or excavation sites
   • location of existing or proposed structures, such as
     buildings, utilities, roads, or bridges

3. **IS THIS APPLICATION FOR** an annual maintenance permit?   ☐ Yes   ☐ No
   (If yes, an annual plan of operation must be attached to this application – see "Information for Applicant")

4. **PROPOSED CONSTRUCTION DATE.** Include a project timeline. Start date __4_ / _1_ / 2019
   Finish date _9_ / _30_ / _19_ Is any portion of the work already completed? ☐ Yes   ☒ No
   (If yes, describe the completed work.)

5. **WHAT IS THE PURPOSE** of the proposed project?
   Install a primary power line to serve privately owned properties

6. **PROVIDE A BRIEF DESCRIPTION** of the proposed project.
   By use of directional bore, install conduit for primary power line beneath creek.

7. **WHAT IS THE CURRENT CONDITION** of the proposed project site? Describe the existing bank condition, bank slope, height, nearby structures, and wetlands.
   Project site lies alongside shoulder of No. McDonald lake road.

8. **PROJECT DIMENSIONS.** How many linear feet of bank will be impacted? How far will the proposed project encroach into and extend away from the water body?
   Zero impact expected.

Exhibit 5
Page 2 of 40

9. **VEGETATION.** Describe the vegetation present on site. How much vegetation will be disturbed or covered with fill material during project installation? (Agencies require that only vegetation necessary to do the work be removed.) Describe the revegetation plan for all disturbed areas of the project site in detail.

Natural stream course vegetation will not be impacted.

10. **MATERIALS.** Describe the materials proposed to be used. Note: This may be modified during the permitting process. It is recommended you do not purchase material until all permits are issued.

| Cubic yards/Linear feet | Size and Type | Source |
|---|---|---|
| N/A | | |

11. **EQUIPMENT.** List all equipment that will be used for construction of the project. How will the equipment be used on the bank and/or in the water? Note: Make sure equipment is clean and free of weeds, weed seeds, and excess grease before using it in the water waterway. To prevent the spread of aquatic invasive species, to the extent practical, remove mud and aquatic plants from heavy machinery and other equipment before moving between waters and work sites, especially in waters known to be infested with aquatic invasive species. Drain water from machinery and let dry before moving to another location.

Directional boring equipment: Boring machine, slurry/pump truck, conduit reel trailer/truck.  No equipment shall be in water or near the bank.

12. **DESCRIBE PLANNED EFFORTS TO MINIMIZE PROJECT IMPACTS.** Consider the impacts of the proposed project, even if temporary.   What efforts will be taken to:

- Minimize erosion, sedimentation, or turbidity?
Directional bore

- Minimize stream channel alterations?
Directional bore

- Minimize effects to stream flow or water quality caused by materials used or removal of ground cover?
Directional bore

- Minimize effects on fish and aquatic habitat?
Directional bore

- Minimize risks of flooding or erosion problems upstream and downstream?
Directional bore

- Minimize vegetation disturbance, protect existing vegetation, and control weeds?
Directional bore

13. **WHAT ARE THE NATURAL RESOURCE BENEFITS** of the proposed project?
Provide power for new septic/sewage treatment systems.

14. **LIST ALTERNATIVES** to the proposed project.  Why was the proposed alternative selected?
No other alternatives exist.

Exhibit 5
Page 3 of 40

**D. ADDITIONAL INFORMATION FOR SECTION 404, SECTION 10, AND FLOODPLAIN PERMITS ONLY.**
If applying for a Section 404 or Section 10 permit, fill out questions 1-3. If applying for a floodplain permit, fill out questions 3-6. (Additional information is required for floodplain permits – See "Information for Applicant.")

1.  Will the project involve placement of dredged (excavated) and/or fill material below the ordinary high water mark, in a wetland, or other waters of the US? If yes, what is the surface area to be filled? How many cubic yards of fill material will be used? Note: Wetland delineations are required if wetlands are affected.

2.  Description of avoidance, mitigation, and compensation (see Information for Applicant). Attach additional sheets if necessary.

3.  List the names and address of landowners adjacent to the project site. This includes properties adjacent to and across from the project site. (Some floodplain communities require certified adjoining landowner lists).

4.  List all applicable local, state, and federal permits and indicate whether they were issued, waived, denied, or pending. Note: All required local, state, and federal permits, or proof of waiver must be issued prior to the issuance of a floodplain permit.

5.  Floodplain Map Number _____

6.  Does this project comply with local planning or zoning regulations? ☑ Yes    ☐ No

**E. SIGNATURES/AUTHORIZATIONS -- Each agency must have original signatures signed in blue ink.**

**After completing the form,** make the required number of copies and **then sign each copy.** Send the copies with original signatures and additional information required directly to each applicable agency.

The statements contained in this application are true and correct. The applicant possess' the authority to undertake the work described herein or is acting as the duly authorized agent of the landowner. The applicant understands that the granting of a permit does not include landowner permission to access land or construct a project. Inspections of the project site after notice by inspection authorities are hereby authorized.

APPLICANT (Person responsible for project):
Print Name: Flathead Electric Cooperative

LANDOWNER:
Print Name: Glacier National Park

_____   2/1/19
Signature of Applicant          Date

_____
Signature of Landowner          Date

*CONTRACTOR/AGENT:
Print Name: Rocky Mountain Contractors

_____
Signature of Contractor/Agent    Date
*Contact agency to determine if contractor signature is required.

Exhibit 5
Page 4 of 40

Form 270a FCD (rev 2015)
(Required to be completed as **part of the 310-application** if anyone except the landowner is responsible for work on the project.
AR, Rule 7 (b)

## Stream Work Authorization and Permission
### For the
### Mt. Natural Streambed & Land Preservation Act ("310")

_Landowner Information_:

Name: US Government, Glacier National Park

Mailing Address: PO Box 128

West Glacier, MT 59936

_Applicant/Contractor Information:_

Name: Flathead Electric Cooperative

Address: 2510 US Hwy 2 East

Kalispell, MT 59901

As the landowner, I do hereby give permission to the above named applicant/contractor to enter upon and to proceed with work on my property located at:

Site Address: 599 North McDonald Lake Road

Glacier National Park, MT 59936

I also authorize the inspection of the project site by inspecting authorities.

I understand that I, as current legal landowner, am also responsible to see that the work meets the final specifications as determined by the Flathead Conservation District.

Signed,

_____     _____
Landowner signature – _faxed, electronic, and photocopied signatures are acceptable_     (Date)

**Attach original to 310-application & return to:**
Flathead Conservation District
133 Interstate Lane
Kalispell, MT  59901
_Phone (406) 752-4220, Fax (406) 752-4077_

Exhibit 5
Page 5 of 40



Exhibit 5
Page 6 of 40



Exhibit 5
Page 7 of 40

NAME: McDonald Lake Creek Bores

WO #: 2018 0143   &   2018 1635

DATE: 1/31/19

BY: Dave P

SCALE: None                SHEET   1   OF   1



TYPICAL CREEK BORE

BORE PIT AREA

20'+

20'+

BORE PIT AREA

3" CONDUIT BORE

5" MINIMUM

5' MINIMUM

Exhibit 5
Page 8 of 40



FL2019005    2019
LO Name: GNP
Stream: Unnamed
S11T33R18Topog: Mt Canon
/Camas Ridge E.  Supervisor/s: RB

ROAD CLASSIFICATION

ad, all weather,     Unimproved road, fair or dry
face _____       weather  ------------

Mapped, edited, and published by the Geological

Control by USGS and USC&GS

Topography by photogrammetric methods from aerial
photographs taken 1966. Field checked 1968

Polyconic projection.  1927 North American datum
10,000-foot grid based on Montana coordinate system,
north zone

Exhibit 5
Page 9 of 40



FLATHEAD COUNTY GIS

KALISPELL, MONTANA

GIS Home
|
Downloadable Data
|
Search
|
Help
|
Contact Us

map scale: **1:7,985** map center: **latitude 48° 38' 8.65 longitude -113° 51' 16.35** active tool: **pan map** active layer: Parcel Owners Physical Address ▼

Exhibit 5
Page 10 of 40

Form 273 (Rev. 09/22/03)
(file name 273-03.doc)

**310 PERMIT**
**CONSERVATION DISTRICT'S DECISION**

DECISION DATE: 2/11/19

Notice: THIS AUTHORIZATION DOES NOT GIVE PERMISSION TO CARRY OUT A PROJECT ON LAND THAT IS NOT OWNED BY THE HOLDER OF THIS PERMIT. Landowner permission, easements or other federal, state, or local permits, licenses, special use permits, or authorizations may be required before construction of the project. It is the duty of the holder of this permit to determine which are necessary and obtain them prior to construction of the project.

Landowner Name/Address: **Glacier National Park, PO Box 128, West Glacier, MT  59936**
Applicant Name/Address: **Flathead Electric Coop, 2214 US Hwy 2 E., Kalispell, MT  59901**
Perennial Stream:  **Unnamed**  Section:  **11**   Township:  **33**  Range:  **18**

| Supervisors' Decision (check) | Explanation: |
|---|---|
| ☒ Approved | |
| ☐ Approved With Modifications | |
| ☐ Denied | *utilities* |
| ☐ Not A Project | |
| | ☒ See Attached (if more room is necessary) |

☐ Check here if **15-day waiting period** has been waived

Work may begin on or after: 2/25/19

**Permit Expiration Date:** 7/1/2019

Date Transmitted to Applicant & DFWP: 2/15/19

**Supervisors' Signatures**

*[signatures]*

### TO BE COMPLETED BY THE APPLICANT
Check the appropriate box, sign and return a copy to the district office **within 15 days** of receipt of this permit.

☐ **I agree** to proceed with the project in accordance with the approved application and specifications outlined in this permit and will allow a follow-up inspection.

☐ **I disagree** with the terms of this permit and I will seek judicial review in **district court** within 15 days of receipt of this permit. (This box may only be checked if you did not sign an arbitration agreement when you submitted your application.)

☐ **I disagree** with the terms of this permit and hereby request **arbitration**. I agree to abide by the arbitration agreement attached to or on the **reverse of this form** – OR, if an arbitration agreement was signed when the permit application was submitted, I will abide that agreement.

Signature of Applicant: _____     Date: _____

**FLATHEAD CONSERVATION DISTRICT**
133 Interstate Lane, Kalispell, MT  59901  Phone: 406-752-4220  Fax: 406-752-4077  www.flatheadcd.org

310-PERMIT APPLICATION #FL2019005, Unnamed Stream, GNP

Exhibit 5
Page 11 of 40

Form 271 (Rev. 09/22/03)

## NATURAL STREAMBED AND LAND PRESERVATION ACT - ARBITRATION AGREEMENT

The Natural Streambed and Land Preservation Act arbitration process is governed by the Uniform Arbitration Act, MCA §27-5-111 through §27-5-324, except as expressly provided as provided herein. According to MCA §75-15-112, any team member may request arbitration. The team includes the applicant, a representative of the Department of Fish, Wildlife and Parks, and a representative of the conservation district.

**1. Parties.** The applicant and the conservation district are always a party to the arbitration process. If the applicant requests arbitration, parties will include the applicant and the conservation district. If the Department of Fish, Wildlife and Parks requests arbitration, parties will include the Department of Fish, Wildlife and Parks, the applicant, and the conservation district. If the conservation district representative requests arbitration, the parties will include the conservation district, the conservation district's representative, and the applicant. The team member requesting arbitration is the contesting party.

**2. Administering Agency.** The conservation district or the county attorney will act as the administering agency for the arbitration process. The conservation district shall provide clerical services to collect fees associated with the costs of the arbitration panel.

**3. Selection of the Arbitration Panel.** Within 30 days of the request for arbitration, the contesting party and the conservation district will submit to the administering agency the names and qualifications of three consenting persons who reside in the judicial district in which the dispute is taking place. The consenting persons must reside in the judicial district in which the dispute takes place. The parties may agree on a list of no less than four consenting persons to act as the arbitrators to be submitted to the senior judge. That list shall contain all of the names and qualifications of the consenting persons without designating the party submitting the names to the conservation district. The senior judge will select three persons from the list who, from a review of the qualifications, appear to be the most impartial to serve as arbitrators. If the contesting party fails to submit names within 30 days, the request for arbitration is deemed withdrawn. If the other parties fail to submit names and qualifications, the arbitrators must be selected from the list provided by the administrating agency by the senior district judge. The arbitration panel shall only sit for the period of time necessary to settle the dispute before it and will review the proposed project pursuant to this arbitration agreement and in accordance with the statutory criteria set forth in MCA §75-7-112, implementing rules, and the policy set forth by MCA §75-7-102. The panel may appoint a chair. The powers of the arbitration panel shall be exercised by majority agreement of the panel. If during the course of the hearing an arbitrator ceases to act, the remaining panel members may continue with the hearing and make a determination on the dispute.

**4. Costs of the Arbitration.** Costs of the arbitration panel, computed as for jurors' fees under MCA §3-15-201, shall be borne by the contesting party. Clerical costs of the panel shall be paid by the non-prevailing party as determined by the panel. For all other expenses, including counsel fees, each party shall bear its own costs.

**5. Prehearing.** The panel may call a prehearing conference to set the arbitration schedule, and to request specific written information from the parties.

**6. Date, Time, and Place of Hearing.** The panel will select the time and place for the hearing. The hearing must be held in the judicial district in which the dispute takes place. The panel may consider requests for specific locations for the hearing. The panel may conduct on-site inspections. The panel may require the parties to submit copies of exhibits and a summary of its case, including a list of witnesses, to the panel and all other parties, prior to the hearing.

**7. Notice of Hearing.** Not less than ten days before the hearing, the administering agency shall give notice to each party. The notice must be by personal delivery or by certified mail. The notice shall include a description of the subjects and issues involved and the time and place of the hearing.

**8. Representation.** All parties have the right to be represented by an attorney. The arbitration panel may request the district court issue subpoenas for the attendance of witnesses and the production of books, records, documents, and other evidence and may administer oaths. The provisions of law providing for service of subpoenas are applicable. The arbitration panel may permit a deposition to be taken of a witness who cannot be subpoenaed or is unable to attend the hearing. At the conclusion of the hearing, the panel may take the matter under advisement. A majority of the panel will render a final decision.

**9. Procedure at the Hearing.** Each party may give opening statements, describing, generally, their position on the supervisors' decision. The contesting party will then present its witnesses and evidence. If there is more than one contesting party, then the chair shall determine the order of presentation by the contesting parties. The other parties will follow, in turn as directed by the chair, with their witnesses and evidence. A witness is subject to cross-examination by the parties to the proceeding. A panel member may ask questions of any witness or party to the dispute. Each party may conclude with closing remarks or statements summarizing their positions and evidence. The hearing must be tape-recorded. If the judicial review is necessary, the tapes or relevant portions of the tapes may be transcribed. The parties may arrange for a transcription of the hearing at their own cost.

**10. Award.** The award is the final decision of the arbitration panel. The award must be in writing and signed by the arbitrators. The arbitration panel's award must be issued within 60 days after the hearing. The arbitration panel shall deliver a copy of the decision to each of the parties and the district judge either personally or by certified mail. The district court shall confirm the panel's award, unless a party applies and shows grounds for vacating, modifying, or correcting the award.

**11. Judicial Review.** If the panel's decision is contested, the court will review the panel's decision in accordance with MCA §27-5-312 and 313, Uniform Arbitration Act.

**12. Other.**   Please specify.

_____ Date:_____          _____ Date:_____
Requesting Party                                                        Conservation District

310-PERMIT APPLICATION #FL2019005, Unnamed Stream, GNP

Exhibit 5
Page 12 of 40



**Flathead Conservation District**
133 Interstate Lane, Kalispell, MT  59901
Phone:  406-752-4220   Fax:  406-752-4077
Website:  www.flatheadcd.org

### 310-PERMIT ATTACHMENT

**MONTANA NSLPA 310 PERMIT:** #FL2019005, unnamed stream, GNP
**Legal Description:** S11 T33 R18
**Landowner:** Glacier National Park, PO Box 128, West Glacier, MT  59936
**Applicant:** Attn: David Preble, Flathead Electric Coop.,
2510 US Hwy 2 East, Kalispell, MT  59901
**Stream:** Unnamed
**Decision Date:** 2/11/2019
**Approved Project:** utilities
**Permit Expiration Date:** 7/1/2019

**WORK MAY BEGIN ON OR AFTER:**   2/25/2019
(Note: If date listed, this date is 15-days after the decision is made. Day 1 is date of decision) <u>only</u> if the "310 PERMIT CONSERVATION DISTRICT'S DECISION" form has been signed by the applicant/landowner & returned to the Flathead CD <u>within 15 days</u> of receipt of the permit. Failure to return the form will automatically **VOID** the permit without further warning.

**SPECIFICATIONS & STANDARDS**
Work is to be completed as outlined in the application, in addition to the following **points**:

<u>UTILITY LINES (ELECTRICAL, SEWER LINES – DISPOSAL FACILITIES,
UTILITY LINE BURIAL – BORING - TRENCHING, WATERLINES, WELLS AND CISTERNS)</u>
     **Standards**
       a.     **Sewer lines/Disposal facilities**:
           Streamside sewage pump out facilities may be placed in public or private marinas or public parks.
           i.    Such facilities must include equipment to pump or otherwise receive and transfer contents of vessel holding tanks into a sewage retention and/or disposal system located outside the flood plain.
           ii.   Such facilities must include in the design appropriate plans to prevent all spillage or leakage from entering the stream.

       b.     **Utility Line Burial**:

           i.    **Boring**
               1.   The proposed activity may be determined by the board, after reviewing the application, to not be a project requiring a permit if utility line boring takes place a minimum of twenty (20) feet away from the top of the highest bench of the bank, and takes place a minimum of five (5) feet below the lowest part of the stream.

310-Permit #FL2019005, Unnamed, GNP

Exhibit 5
Page 13 of 40

2.  No discharged material from the drilling process can enter into the stream and its' immediate banks.

3.  This rule can only be used if the Flathead Conservation District office is notified ten (10) days before the proposed project is to begin and standards i.1. and i.2. are met.

## ARBITRATION

Note that if you do not agree with the Conservation District's Decision you may request arbitration, or seek judicial review in district court within 15 days of receipt of this permit. (Note: the day after receipt is considered day 1) (See NATURAL STREAMBED AND LAND PRESERVATION ACT - ARBITRATION AGREEMENT on the back side of the 310 PERMIT CONSERVATION DISTRICT'S DECISION form).

## WORK COMPLETION, PERMIT EXTENSION, INSPECTION

- When work has been completed, you are required to fill out and return the enclosed 310-PERMIT WORK COMPLETION FORM to the Flathead Conservation District office so that a follow-up inspection can be made.

- If the project is not completed, a written request for a **time extension** must be received in the Flathead Conservation District office prior to the expiration date. (Note: only one time extension is allowed.) If the extension request is received after the expiration date, you must re-apply for another permit. You must have a valid permit before beginning any work.

- The Flathead Conservation District retains the right to inspect the project during and after construction, and will contact the landowner/applicant.

## RELIANCE ON APPLICANT'S DATA

It is the determination of this office that issuance of this permit was made in reliance on the information you provided.

## RE-EVALUATION OF PERMIT DECISION

This office may re-evaluate its decision on this permit at any time the circumstances warrant. Circumstances that could require a reevaluation include, but are not limited to, the following:

a.  You fail to comply with the terms and conditions of this permit.

b.  The information provided by you in support of your permit application proves to have been false, incomplete, or inaccurate (See RELIANCE ON APPLICANT'S DATA)

c.  Significant new information surfaces which this office did not consider in reaching the original decision.

**310-Permit #FL2019005, Unnamed, GNP**

Exhibit 5
Page 14 of 40

**PERMITTEE'S RISK**
**The permittee is hereby notified that any financial outlay or work invested in a project pursuant to this authorization is at the permittee's risk. The issuance of this authorization does not reduce the permittee's liability for damage caused by development of the authorized project. Nor does the conservation district in issuing this authorization in any way acknowledge liability for damage caused by the permittee's development of the authorized project.**

**OTHER NECESSARY PERMITS**
The FCD Board of Supervisors advises that **the issuance of a 310-permit does not relieve the parties involved from securing other necessary permits** which are listed in the application form.


Ronald Buentemeier, Supervisor


cc:        Montana Fish, Wildlife and Parks, Kalispell
           Landowner


ORIGINAL to:   Applicant


**310-Permit #FL2019005, Unnamed, GNP**

Exhibit 5
Page 15 of 40

310-Permit #FL2019005, Unnamed, GNP

Exhibit 5
Page 16 of 40

# 310-Permit Work Completion Form

## 310-Permit Information

**MONTANA NSLPA 310 PERMIT:** #FL2019005, unnamed stream, GNP

**Legal Description:** S11 T33 R18

**Landowner:** Glacier National Park, PO Box 128, West Glacier, MT 59936

**Applicant:** Attn: David Preble, Flathead Electric Coop.,
2510 US Hwy 2 East, Kalispell, MT 59901

**Stream:** Unnamed

**Decision Date:** 2/11/2019

**Approved Project:** utilities

**Permit Expiration Date:** 7/1/2019

## Requirements

- The Applicant/Landowner is required to return this form to the Flathead Conservation District when work is completed or the permit expires.
- Include pre and post <u>photos</u> of the project.

## Date work completed _____

Note: If work not completed, provide explanation below.

## Explanation

_____

_____

_____

## Contact Information (Required for Follow-Up Inspection)

Name _____

Address _____

Phone/Cell # _____

Email _____


Flathead Conservation District
133 Interstate Lane, Kalispell, MT 59901, Phone: 406-752-4220, Fax 406-752-4077
Website: www.flatheadcd.org

Rev. 5/2017


**310-Permit #FL2019005, Unnamed, GNP**

Exhibit 5
Page 17 of 40

310-Permit #FL2019005, Unnamed, GNP

Exhibit 5
Page 18 of 40

Form 273 (Rev. 09/22/03)
(file name 273-03.doc)

# 310 PERMIT
## CONSERVATION DISTRICT'S DECISION

DECISION DATE: 2/11/19

**Notice:** THIS AUTHORIZATION DOES NOT GIVE PERMISSION TO CARRY OUT A PROJECT ON LAND THAT IS NOT OWNED BY THE HOLDER OF THIS PERMIT. Landowner permission, easements or other federal, state, or local permits, licenses, special use permits, or authorizations may be required before construction of the project. It is the duty of the holder of this permit to determine which are necessary and obtain them prior to construction of the project.

Landowner Name/Address: **Glacier National Park, PO Box 128, West Glacier, MT  59936**
Applicant Name/Address: **Flathead Electric Coop, 2214 US Hwy 2 E., Kalispell, MT  59901**
Perennial Stream: **Unnamed** Section: **11**   Township: **33** Range: **18**

**Supervisors' Decision** (check)

[X] Approved
[ ] Approved With Modifications
[ ] Denied
[ ] Not A Project

Explanation: _____

_____

_utilities_

[X] See Attached (if more room is necessary)

[ ] Check here if **15-day waiting period** has been waived

Work may begin on or after: __2/28/19__

**Permit Expiration Date:** __7/1/2019__

Date Transmitted to Applicant & DFWP: __2/15/19__

**Supervisors' Signatures**

_Pate C Smee_
_Ron Slum_
_Jack Sd_
_Verdell Jackson_
_Ronald Blystone_
_Dean Sirucek_

---

## TO BE COMPLETED BY THE APPLICANT
Check the appropriate box, sign and return a copy to the district office **within 15 days of receipt of this permit.**

☐ **I agree** to proceed with the project in accordance with the approved application and specifications outlined in this permit and will allow a follow-up inspection.

☐ **I disagree** with the terms of this permit and I will seek judicial review in **district court** within 15 days of receipt of this permit. (This box may only be checked if you did not sign an arbitration agreement when you submitted your application.)

☐ **I disagree** with the terms of this permit and hereby request **arbitration**. I agree to abide by the arbitration agreement attached to or on the **reverse of this form** – OR, if an arbitration agreement was signed when the permit application was submitted, I will abide that agreement.

Signature of Applicant: _____   Date: __2/19/19__

**FLATHEAD CONSERVATION DISTRICT**
133 Interstate Lane, Kalispell, MT  59901   Phone: 406-752-4220   Fax: 406-752-4077   www.flatheadcd.org

RECEIVED
FEB 21 2019
Flathead CD

310-PERMIT APPLICATION #FL2019005, Unnamed Stream, GNP

Exhibit 5
Page 19 of 40

Form 271 (Rev. 09/22/03)

## NATURAL STREAMBED AND LAND PRESERVATION ACT - ARBITRATION AGREEMENT

The Natural Streambed and Land Preservation Act arbitration process is governed by the Uniform Arbitration Act, MCA §27-5-111 through §27-5-324, except as expressly provided as provided herein. According to MCA §75-15-112, any team member may request arbitration. The team includes the applicant, a representative of the Department of Fish, Wildlife and Parks, and a representative of the conservation district.

**1. Parties.** The applicant and the conservation district are always a party to the arbitration process. If the applicant requests arbitration, parties will include the applicant and the conservation district. If the Department of Fish, Wildlife and Parks requests arbitration, parties will include the Department of Fish, Wildlife and Parks, the applicant, and the conservation district. If the conservation district representative requests arbitration, the parties will include the conservation district, the conservation district's representative, and the applicant. The team member requesting arbitration is the contesting party.

**2. Administering Agency.** The conservation district or the county attorney will act as the administering agency for the arbitration process. The conservation district shall provide clerical services to collect fees associated with the costs of the arbitration panel.

**3. Selection of the Arbitration Panel.** Within 30 days of the request for arbitration, the contesting party and the conservation district will submit to the administering agency the names and qualifications of three consenting persons who reside in the judicial district in which the dispute is taking place. The consenting persons must reside in the judicial district in which the dispute takes place. The parties may agree on a list of no less than four consenting persons to act as the arbitrators to be submitted to the senior judge. That list shall contain all of the names and qualifications of the consenting persons without designating the party submitting the names to the conservation district. The senior judge will select three persons from the list who, from a review of the qualifications, appear to be the most impartial to serve as arbitrators. If the contesting party fails to submit names within 30 days, the request for arbitration is deemed withdrawn. If the other parties fail to submit names and qualifications, the arbitrators must be selected from the list provided by the administering agency by the senior district judge. The arbitration panel shall only sit for the period of time necessary to settle the dispute before it and will review the proposed project pursuant to this arbitration agreement and in accordance with the statutory criteria set forth in MCA §75-7-112, implementing rules, and the policy set forth by MCA §75-7-102. The panel may appoint a chair. The powers of the arbitration panel shall be exercised by majority agreement of the panel. If during the course of the hearing an arbitrator ceases to act, the remaining panel members may continue with the hearing and make a determination on the dispute.

**4. Costs of the Arbitration.** Costs of the arbitration panel, computed as for jurors' fees under MCA §3-15-201, shall be borne by the contesting party. Clerical costs of the panel shall be paid by the non-prevailing party as determined by the panel. For all other expenses, including counsel fees, each party shall bear its own costs.

**5. Prehearing.** The panel may call a prehearing conference to set the arbitration schedule, and to request specific written information from the parties.

**6. Date, Time, and Place of Hearing.** The panel will select the time and place for the hearing. The hearing must be held in the judicial district in which the dispute takes place. The panel may consider requests for specific locations for the hearing. The panel may conduct on-site inspections. The panel may require the parties to submit copies of exhibits and a summary of its case, including a list of witnesses, to the panel and all other parties, prior to the hearing.

**7. Notice of Hearing.** Not less than ten days before the hearing, the administering agency shall give notice to each party. The notice must be by personal delivery or by certified mail. The notice shall include a description of the subjects and issues involved and the time and place of the hearing.

**8. Representation.** All parties have the right to be represented by an attorney. The arbitration panel may request the district court issue subpoenas for the attendance of witnesses and the production of books, records, documents, and other evidence and may administer oaths. The provisions of law providing for service of subpoenas are applicable. The arbitration panel may permit a deposition to be taken of a witness who cannot be subpoenaed or is unable to attend the hearing. At the conclusion of the hearing, the panel may take the matter under advisement. A majority of the panel will render a final decision.

**9. Procedure at the Hearing.** Each party may give opening statements, describing, generally, their position on the supervisors' decision. The contesting party will then present its witnesses and evidence. If there is more than one contesting party, then the chair shall determine the order of presentation by the contesting parties. The other parties will follow, in turn as directed by the chair, with their witnesses and evidence. A witness is subject to cross-examination by the parties to the proceeding. A panel member may ask questions of any witness or party to the dispute. Each party may conclude with closing remarks or statements summarizing their positions and evidence. The hearing may be tape-recorded. If the judicial review is necessary, the tapes or relevant portions of the tapes may be transcribed. The parties may arrange for a transcription of the hearing at their own cost.

**10. Award.** The award is the final decision of the arbitration panel. The award must be in writing and signed by the arbitrators. The arbitration panel's award must be issued within 60 days after the hearing. The arbitration panel shall deliver a copy of the decision to each of the parties and the district judge either personally or by certified mail. The district court shall confirm the panel's award, unless a party applies and shows grounds for vacating, modifying, or correcting the award.

**11. Judicial Review.** If the panel's decision is contested, the court will review the panel's decision in accordance with MCA §27-5-312 and 313, Uniform Arbitration Act.

**12. Other.** Please specify.

_____ Date:_____    _____ Date:_____
Requesting Party                                  Conservation District

310-PERMIT APPLICATION #FL2019005, Unnamed Stream, GNP

Exhibit 5
Page 20 of 40

Form 272 (filename 27206)
## STATE OF MONTANA NATURAL STREAMBED AND LAND PRESERVATION ACT (310 LAW)
### TEAM MEMBER REPORT

| Landowner | **Glacier National Park** | | Applicant | **Flathead Electric** |
|---|---|---|---|---|
| Section **11** Township **33** Range **18** | | Stream **Unnamed** | County | **Flathead** |
| Latitude | | | Longitude | |
| Location | | *No Onsite per Rule* | | |

| | Date | Time |
|---|---|---|

Project Description (e.g., culvert, dock, bank stabilization...)  *No onsite because they are following Rule*

Participants  *Q. 2Li*

| Review Considerations | Comments |
|---|---|
| (a) Effects of soil erosion and sedimentation | *Minimal* |
| (b) Risk of flooding or erosion problems upstream or down | *Minimal* |
| (c) Effects of stream channel alterations | *Minimal* |
| (d) Effects on stream flow, turbidity, or water quality caused by materials used or by removal of ground cover | *Minimal* |
| (e) Effects on fish and aquatic habitat | |
| (f) Are there reasonable alternatives to reduce disturbance to stream or better accomplish the purpose of the project? | ☐ Yes          ☒ No |

| Recommendation |
|---|
| ☒ Approval as proposed |
| ☐ Approval with modifications (list on reverse) |
| ☐ Not a project under our jurisdiction (list reason/s on reverse) |
| ☐ Denial (list reason/s on reverse) |

☒ Waive 15-day waiting period after board's decision

Under FCD Adopted Rules, the **term of a permit is one year** from the date of the supervisor's decision. If term is less than one year, specify date **and reason.**

Alternate expiration date: _July 1, 2019_ (list reason/s on reverse)

**Signature of Team Member(s)**

_Ronald Bruntsmeier_                                    2-13-19
FCD Supervisor                                                  Date

_[signature]_                                                        2/11/19
FWP Representative                                              Date

_____
Applicant or Applicant's Representative                  Date
☐ Waive participation in this recommendation  _____ (initial)

310-Permit Application #FL2019005, Unnamed, GNP                    FCD 12/2017

Exhibit 5
Page 21 of 40

Excerpts from Montana Code Annotated, The Natural Streambed and Land Preservation Act of 1975
75-7-103 Definitions. "Team" means one representative of the supervisors, one representative of the
department (of Montana Fish, Wildlife & Parks), and the applicant or the applicant's representative.
75-7-112 Procedure for considering projects – team. Each member of the team shall recommend in
writing, within 30 days of the date of inspection, denial, approval or modification of the project to the
supervisors. The applicant may waive participation in this recommendation.
*FCD Adopted Rules provide that a non-response by the applicant is considered a waiver in participation.*

**Comments**

310-Permit Application #FL2019005, Unnamed, GNP                    FCD 12/2017

Exhibit 5
Page 22 of 40

**Ginger Kauffman**

| | |
|---|---|
| **From:** | Rosenthal, Leo <lrosenthal@mt.gov> |
| **Sent:** | Wednesday, February 13, 2019 4:46 PM |
| **To:** | Ginger Kauffman; Breidinger, Kenneth |
| **Subject:** | RE: 318's |

Hi Ginger. The 318 authorization is not needed for the 3 GNP projects and the Stalowy project.
Leo

**From:** DNRC Flathead CD [mailto:gingerk@flatheadcd.org]
**Sent:** Wednesday, February 13, 2019 10:14 AM
**To:** Breidinger, Kenneth <KBreidinger@mt.gov>; Rosenthal, Leo <lrosenthal@mt.gov>
**Subject:** 318's

Kenny & Leo,

I am working on permits. Please send me 318's for:

FL2019008, S. Fork Canyon Creek, FH Stoltze
FL2019009, various streams, FH Stoltze
FL2019005, unnamed stream, GNP
FL2019006, unnamed stream, GNP
FL2019007, unnamed stream, GNP
FL2019003, Trumbull Creek, NW Dev. Group
FL2019002, Bear Creek, Stalowy

Thank-you!


Ginger Kauffman, Administrator

Flathead Conservation District
133 Interstate Lane
Kalispell, MT  59901

Phone: 406-752-4220
Fax:  406-752-4077
Website:  flatheadcd.org

Exhibit 5
Page 23 of 40

Exhibit 5
Page 24 of 40

**INSTRUCTIONS: Circle** any **specific** items listed below (from FCD Adopted Rules) **which are to be included** in the PERMIT ATTACHMENT.

## Basic Wording

a.  All work must be completed in as expeditious a manner as possible and must take place during low flow periods.

b.  Work must be conducted to minimize impact on the stream and immediate vicinity, with use of machinery in stream only when absolutely necessary. To prevent leaks of petroleum products into the waterway, defective equipment must not be operated in areas capable of contributing surface flows to the waterway.

c.  Any excess material generated from a project must be disposed of out of the flood plain and not in an area classified as a wetland.

d.  All disturbed areas (including any spoils or excess material) must be shaped, seeded to grass, and lightly mulched to control erosion and prevent the infestation of noxious weeds. Existing vegetation must be preserved wherever possible. Revegetation with trees and shrubs is encouraged.

### CHAPTER 2 - CONSTRUCTION STANDARDS & MATERIALS

A.  **CONSTRUCTION STANDARDS**

1.  Projects must be designed and constructed using methods that minimize:
    a.  Adverse impacts, both upstream and downstream.
    b.  Future disturbance to the stream.

2.  All disturbed areas must be managed during construction and reclaimed after construction to minimize erosion and sedimentation. Weed control must be undertaken and maintained on any disturbed areas.

3.  Temporary structures used during construction must be designed to handle high flows reasonably anticipated during the project construction period. Temporary structures must be completely removed from the stream channel at the conclusion of construction and the area must be restored to a natural and stable condition.

4.  Channel alterations must be designed to retain original stream length or otherwise provide hydrologic stability.

5.  Riprap, rock, or other material used in a project must be of adequate size, shape, and must be properly placed to protect the streambank from erosion.

6.  The District may:
    a.  Limit the time and duration of construction to minimize impacts to the stream or associated aquatic life;
    b.  Require the applicant to submit engineering designs, when in the District's judgment, the project's complexity requires greater assurance of project stability to minimize impacts to the stream;
    c.  Require the applicant to provide project completion documentation that may include photographs.

---

310-Permit Application #FL2019005, Unnamed, GNP                    FCD 12/2017

Exhibit 5
Page 25 of 40

7. The following activities are discouraged but may be authorized:
   a. Placement of road fill material in a stream;
   b. Placement of debris or other materials in a stream where it can erode or float back into the stream;
   c. Projects that permanently prevent fish migration;
   d. Operation of construction equipment in a stream;
   e. Excavation of streambed gravels.

8. Equipment must not be operated below the existing water surface without specific approval from the District. Fording the stream at one location will be permitted only on a case-by-case basis.

9. Care must be taken to cause only the minimum necessary disturbance to the natural appearance of the area. Stream bank vegetation must be protected except where its removal is absolutely necessary for completion of the work. Any vegetation, debris, or other material removed during construction must be disposed of at some location out of the flood plain where it cannot re-enter the channel during high stream flows. All new cut or fill slopes must be immediately seeded, vegetated, or otherwise protected to prevent erosion.

## B.   CONSTRUCTION MATERIALS

1. **Findings**
   Building material should be stable and free of silts, sands, clays, chemical preservatives, grease, oil or any surface application that could degrade or contaminate water quality.

2. **Standards**

   a. **Asphalt**
      Asphalt or similar petroleum based products intended for use as a travel or walking surface are prohibited.

   b. **Concrete**
      1. Wet concrete must not be poured into or allowed to come in contact with the water. Concrete poured within water-tight forms may be approved.

      2. Concrete is not allowed for bank stabilization unless the provisions established by the Montana Department of Environmental Quality are met. When an applicant presents information to the Supervisors that the DEQ has certified that concrete may be used for bank stabilization, concrete will be allowed if the use of concrete is a reasonable means of accomplishing the purpose of the proposed project.

   c. **Fabrics**
      All erosion control blanket or fabric used in or adjacent to streams must be composed of degradable material to ensure decomposition. Plastic, stabilized netting or stabilized open mesh is prohibited, as these products take a long time to degrade and they can trap small animals, birds, amphibians, and fish. This prohibition on plastic also applies to mesh materials used for wattles, rolled materials, and bank wraps.

---

310-Permit Application #FL2019005, Unnamed, GNP                    FCD 12/2017

Exhibit 5
Page 26 of 40

    d.   **Foam flotation logs**

       1.  Styrofoam logs, as a method of flotation, are prohibited.  Extruded polystyrene (blue logs) or similar single cell foam is allowed.  Composite or plastic materials may be allowed.

       2.  All foam flotation logs must be completely encased in solid wood (excluding particle board, plywood, or other commercially produced building materials using wood) or in metal.  Drain holes or spaces between wood boards (maximum of one-half (1/2) inch between) are allowed.

    e.   **Metal**

       1.  Any metal may be painted or coated with an inert metal sealant (i.e. paint, plastic, rubber, enamel, etc.) that has thoroughly dried/cured prior to its use.

       2.  Minimal lubrication of critical metal components may be used where necessary for movement.

       3.  No metal used in the project area may contain deposits or a surface application of any of the following:
          a.  Grease or oil
          b.  Paint, varnish or coatings that have not thoroughly cured or dried; or
          c.  Any chemical or substance that will wash off or dissolve when in contact with water.

    f.   **Rock or stone**

       1.  Rock or stone is a preferred natural material for construction.

       2.  All rock or stone that will come in contact with the stream must be free of silts, sands and clays.

    g.   **Wood**

       1.  Pressure treated wood, as allowed by current EPA rules, is permitted.  All other wood must be untreated.

       2.  The prohibition in 2.g.1. does not prohibit the application of paint or stain located landward of the mean high water line under a permit or plan of operation.

       3.  Where wood is used for any project that would at some time be in, or over the water, use only solid wood.  This specifically excludes plywood, particleboard, chipboard, or other building material commercially produced using wood.

## C.   BURNING

  1. **Findings**

Burning of materials on the streambed or banks will cause a degradation of water quality.

  2. **Standards**

Burning of weeds, grass, shrubs, brush, trees, old construction materials, debris from new construction or similar materials below the mean high water line is discouraged, but may be authorized.

---

310-Permit Application #FL2019005, Unnamed, GNP          FCD 12/2017

Exhibit 5
Page 27 of 40

D. **EROSION, SEDIMENTATION AND STORM RUNOFF**

1. **Findings**

   a. Any construction activity that will affect the streambank should incorporate all necessary means to minimize pollution of the stream, including erosion, sediment, and storm runoff controls.

   b. The proposed activity should minimize increased sedimentation, an increase in suspended sediments, or an increased discharge of nutrients into the stream either during its construction or utilization.

2. **Standards**

   a. Unless otherwise specified in these rules, the interface of fill materials, such as riprap, with the stream water must be sloped at a maximum 1.5:1 ratio in order to dissipate wave and stream flow energy. The face of the slope must be covered with suitable materials to prevent soil erosion and slumping of banks.

   b. The natural protective armament of the stream and streambank must be preserved.

   c. Natural vegetation must be preserved wherever possible and as specified in the rules adopted under the Montana Streamside Management Zone Law.

   d. Use of vegetation must be considered as a means of stabilizing erosive areas.

   e. Mechanized equipment is prohibited, except to the extent mechanized equipment is allowed under the Montana Streamside Management Zone Law, 77-5-301, MCA, or as authorized.

General Items – RIPARIAN AREAS

The riparian area of a stream surrounds the stream and includes native trees, shrubs and grasses. These areas are vitally important in maintaining both water quality and quantity. Roots of woody vegetation stabilize the stream banks and minimize erosion and flood damage, protecting your property. Decaying plant materials on the ground serve as a filter to slow sediment and chemicals from entering the water. This keeps the water clean. The fertile soils soak up and hold excess moisture that is released during low flow periods. This helps keep streams flowing during later summer and drought times. The vegetation provides shade which cools the water, enhancing fish survival. It provides resting areas and food for fish (50 to 90% of aquatic food is obtained from streamside trees, and other vegetation). The vegetation also provides important food, nesting sites and cover for land animals and birds. Removal of riparian vegetation can result in channel changes, massive bank sloughing, erosion and property loss or damage.

a. Extra precautions shall be taken to preserve existing riparian vegetation.

b. Clearing of vegetation will be limited to that which is absolutely necessary for construction of the project. We urge all property owners to establish, enhance and maintain the riparian area along their property.

c. All stream bank and adjacent areas disturbed by the construction activity shall be protected with temporary erosion control measures during the construction activities. These areas shall be reclaimed with long-term erosion control measures and revegetated immediately after construction.

d. We encourage the landowners to leave as much native vegetation as possible but realize that property owners usually desire to be able to view the water on their lot. Trimming the height of riparian vegetation is preferable to removing it entirely. We advocate the removal of vegetation only in segments, interspersing heavily vegetative areas with cleared areas. This method allows for viewing of the stream

310-Permit Application #FL2019005, Unnamed, GNP                    FCD 12/2017

Exhibit 5
Page 28 of 40

yet does not destroy the riparian areas.

E.   **EXCAVATION OR FILLING OF MATERIALS**
   1.  **Findings**
      a.   The stream should be preserved in its natural condition to the greatest extent possible, in order to protect fish and wildlife habitat and water quality.
      b.   Increased sedimentation in the stream should be minimized to the greatest extent possible, as a protection for fish habitat and water quality.

   2.  **Standards**
      a.   Any material that is excavated from the streambed or banks must be removed entirely from the stream and flood plain and deposited in such a manner so as to prevent re-entry of the material into the stream.
      b.   Temporary stockpiling of excavated materials anywhere in the flood plain is prohibited.

## CHAPTER 3 - PROJECT STANDARDS

Any proposed project must meet the following standards:

A.   **BANK STABILIZATION**
   1.  **Findings**
      a.   Retaining walls, riprap, and other bank stabilization methods significantly alter wave actions, currents, beach dynamics, bank erosion patterns, and may affect neighboring property and alter the stream channel on neighboring properties.
      b.   Retaining walls that extend land area into a stream have an increased potential to significantly alter wave actions, currents, beach dynamics, bank erosion patterns, and alter the stream channel on neighboring properties.
      c.   Alternatives exist to retaining walls which do not significantly alter wave actions, currents, beach dynamics, bank erosion patterns, or alter the stream channel on neighboring properties.
      d.   In determining a reasonable means for bank stabilization, consideration must be given to materials and method of placement.

   2.  **Standards**
      a.   The use of retaining walls solely for landscaping is prohibited.
      b.   Retaining walls designed to extend the land area into the stream are prohibited.
      c.   Retaining walls must be built at or landward of the mean annual high water elevation and must conform to the contours of the existing shoreline.
      d.   Riprap is the primary retaining wall method.  Riprap retaining wall standards are as follows:
         i.    Riprap rock must be angular and sized properly for the specific task unless otherwise specified.
         ii.   All riprap rock must be free of silts, sands or clays.
         iii.  Rock may be handpicked from the immediate stream bank, but removal of said rock is allowed only if a solid armament of rock remains in place. The removal of any rock that exposes silts, sands or clays is prohibited.
         iv.   Unless otherwise specified, riprap rock must be toed-in below the bottom of the stream and be placed at a maximum slope of 1.5:1.

Exhibit 5
Page 29 of 40

    v. Prior to the placement of riprap, filter fabric may be required to be placed along the stream bank and incorporated into the riprap design to inhibit erosion and the washing of sand, silt, and clay through the riprap.

    vi. Use of concrete is not allowed for bank stabilization unless the provisions of the DEQ are followed.

  e. Concrete and other structure type retaining wall standards are as follows:

    i. The landward side of the retaining wall must extend at least two (2) inches but not more than eight (8) inches above the level of backfill to inhibit surface water runoff that may carry sediments to the stream.

    ii. Within five (5) feet landward of any retaining wall, backfill must consist of easily drained gravel, rock, stone, sand or a combination of the above. Drain or weep holes should be provided for in any walls. Do not attempt to establish grass or a yard immediately behind a wall unless a silt barrier is included in the construction design.

    iii. All suitable free draining material as described in e.ii above, excavated for placement of the footings, may be used as backfill behind the wall or else must be deposited outside of the flood plain.

    iv. Backfill is limited to that amount necessary to re-establish the pre-existing slope and contours of the landward side.

    v. If an existing wall has to be replaced, it must be completely removed from the flood plain and the replacement wall must be constructed in essentially the same location as the existing wall. If removal of the wall is unfeasible, or will cause environmental hazards (through sedimentation and erosion), the Board will consider an alternative method.

   General Items:

    1. Rip rap must be keyed in at both ends of the project.

    2. Rip rap must not exceed one foot above mean high water mark.

**B.** **BEAVERS**

 **1. Findings**

  Beaver activity may cause safety hazards or damage that requires management and/or removal.

 **2. Standards**

  a. If beaver problems involve removal of part or all of a beaver dam, the landowner must obtain a 310 Permit.

  b. Landowner must undertake some control of beaver numbers in the permit area.

  c. For beaver control and trapping permits, contact Montana Fish, Wildlife & Parks.

  d. In an emergency, as defined under Rule 4.18. Definitions in Adopted Rules, the emergency procedure set forth in Rule 15 Emergencies in Adopted Rules, must be followed.

**C.** **BOAT RAMPS AND BOAT RAIL SYSTEMS**

 **1. Findings**

  a. Boat ramps have a potential to increase sedimentation in the stream, and diminish water quality.

  b. Boat rail systems may have a lower potential to increase sedimentation in the stream or to diminish water quality.

---

310-Permit Application #FL2019005, Unnamed, GNP       FCD 12/2017

Exhibit 5
Page 30 of 40

    c.     Facilities designed for removal of boats from a stream, such as rail systems, are preferred to attempting to build a dock, shore station, or boat shelter for protection of boats, as the overall impacts tend to be less adverse.

2. **Standards**
    a.     Footings and/or the base of the boat ramp must be constructed below the pre-existing grade of the streambank.
    b.     All material excavated from the stream to construct the boat ramp and not used as the ramp foundation material must be immediately and completely removed from the flood plain and deposited in such a manner as to prohibit its re-entry into the stream.
    c.     Boat ramps must be of the same elevation as the pre-construction stream bed and banks.
    d.     Maximum grade must not exceed fifteen (15) percent.
    e.     All ramps must be finished with non-skid surface to ensure maximum traction for vehicles launching and retrieving boats.
    f.     Concrete boat ramp edges must be thickened to a minimum of twice the average thickness of the ramp in order to prevent erosive undercutting or breaking of ramp edges.
    g.     Launching rails must be securely anchored to the stream bottom.
    h.     The rails of the rail launching system must not exceed four (4) inches in height and the rail system must lie on and follow the grade of the existing stream bed and banks.  No portion of the rail system can extend more than eighteen (18) inches above the immediately adjacent land.
    i.     Only one boat ramp per waterfront property is allowed.
    j.     Ramps must have a maximum width of twelve (12) feet.
    k.     Linked concrete planks are preferred to poured slabs for their durability and natural sediment trapping ability.
    l.     The immediate upstream and downstream banks require bank stabilization to ensure long term stability of the ramp and immediate shoreline.

D.    **BOATHOUSES, BOAT SHELTERS AND SHORE STATIONS**
    1. **Findings**
    These structures have a high potential to significantly alter the natural characteristics of the shoreline and diminish water quality.

    2. **Standards**
    a.     The streambed and bank must not be excavated or dredged in order to provide channels and suitable water depth for boating access to a structure.
    b.     Concentration of runoff into the stream during construction is prohibited.  The design plan must demonstrate that construction activities will not result in the concentration of run-off.
    c.     Roof decks or other elevated decks are prohibited on boathouses, boat shelters and shore stations.
    d.     Boat shelters and shore stations must not be longer than the dock length at that location.
    e.     Boathouses, boat shelters, and shore stations must be constructed with non-reflective materials and designed, constructed and placed to be compatible with adjacent surroundings.

Exhibit 5
Page 31 of 40

    f.    Any roofing material containing asphalt is prohibited.
    g.    Toxic chemicals and pollutants such as petroleum products must not be stored over water.

## E.   BRIDGES

### 1.  Findings

a.   In determining reasonable means of constructing bridges, consideration must be given to timing during low flows, materials, equipment, post-construction erosion control, slope, and construction methodology.

b.   Consideration must be given to proper location of the crossing, protection of the natural channel width and provide for high flow flood events.

### 2.  Standards

a.   All work must be completed in as expeditious a manner as possible and must take place during low flow periods.

b.   Work must be conducted to minimize impact on the stream and immediate vicinity, with use of machinery in stream only when absolutely necessary. To prevent leaks of petroleum products into the waterway, defective equipment must not be operated in areas capable of contributing surface flows to the waterway.

c.   Any excess material generated from a project must be disposed of out of the flood plain and not in an area classified as a wetland.

d.   All disturbed areas (including any spoils or excess material) must be shaped, seeded to grass, and lightly mulched to control erosion and prevent the infestation of noxious weeds. Existing vegetation must be preserved wherever possible. Revegetation with trees and shrubs is encouraged.

e.   Bridges must be installed so that the low point in the road grade is not over the stream crossing. If this is not possible, construct water bars or cross drains in the road grade above the stream crossing.

f.   Drain holes must be put in concrete and steel bridge abutments and wing walls.

g.   Stringers for bridges must conform to a load carrying capacity of Highway Standard-20 (HS20).

h.   Old log bridges are to be removed and not left in stream.

i.   Bridge abutments must not constrict natural channel width.

## F.   CULVERTS

### 1.  Findings

a.   Culverts may create adverse hydrologic conditions, such as drops at inlet or outlet, high velocities and turbulence, and inadequate depths that prevent fish from moving upstream.

b.   In determining a reasonable means of constructing culverts, consideration must be given to timing during low flows, materials, equipment, post-construction erosion control, slope, and construction methodology.

### 2.  Standards

a.   All work must be completed in an expeditious manner and must take place during low flow periods.

b.   Work must be conducted to minimize impact on the stream and immediate vicinity, with use of machinery in stream only when absolutely necessary. To prevent leaks of petroleum products into the waterway, defective equipment

Exhibit 5
Page 32 of 40

must not be operated in areas capable of contributing surface flows to the waterway.

c.  Any excess material generated from a project must be disposed of out of the flood plain and not in an area classified as a wetland.

d.  All disturbed area (including any spoils or excess material) must be shaped, seeded to grass, and lightly mulched to control erosion and prevent the infestation of noxious weeds.  Existing vegetation must be preserved wherever possible.

e.  The fill slope of the crossing must be at a maximum grade of 1.5:1.

f.  The culvert must be properly bedded in gravel and must be on grade with the pre-existing slope of the stream, or buried one (1) inch below the existing gradient, unless otherwise specified.

g.  Both the upper and lower ends of the culvert must be armored with oversize rock to control erosion and piping around the culvert, unless otherwise specified.

h.  Culverts must have a fill depth over the top of the culvert of one-third (1/3) the diameter of the culvert, but no less than one (1) foot.

i.  Culverts must be installed so that the low point in the road grade is not over the stream crossing.  If this is not possible, construct water bars or cross drains in the road grade above the stream crossing.

j.  Dewatering may be required to reduce sedimentation and/or to improve the culvert installation process.  This will be determined on a site by site basis.

k.  The most accurate method of obtaining the proper culvert length is provided in Appendix A, Determining Culvert Length.

## G.  DECKS, WALKWAYS, AND STAIRWAYS

### 1. Findings

a.  Decks, walkways and stairways are all structures that are located landward of high water and are considered constructed surfaces.

b.  If properly placed and constructed these structures typically have minimal impact on the streambank and, in some cases, help to protect the fragile shoreline from foot traffic.

### 2. Standards

a.  Structures must be constructed on the existing terrain.  Stones, gravel or wood are recommended travel surfaces as opposed to concrete.

b.  In determining a reasonable means of constructing decks, structures and stairways, consideration must be given to bank configuration, bank slope, soil stability, and site specific effects.

## H.  DOCKS, WHARVES, PIERS (considered synonyms)

### 1. Findings

a.  Open and floating docks are encouraged as they allow complete water transfer beneath them.  Such docks with large free water transfer areas do not impede current flows and, therefore, do not create stagnant water conditions.

b.  Partially open docks, those constructed of closely spaced piling or planks, allow restricted water transfer but do not completely impede current flows and, consequently, do not create stagnant water conditions.

c.  Solid docks or structures block the transfer of water, thereby impeding current flows.

Exhibit 5
Page 33 of 40

d.  Docks, wharves, and piers have a high potential to interfere with public navigation and public recreation.

e.  Common streambank dock facilities, shared by more than one owner, reduce the overall environmental impacts on the streambed and bank and ease navigational congestion on the stream.

f.  In determining a reasonable means of constructing docks, wharves and piers, consideration must be given to length, width, materials, proximity, and anchoring structures.

2. **Standards**

a.  Docks must not exceed twenty (20) feet in length, not to include the ramp (gangway).

b.  Where the depth of the water, at the end of a twenty (20) foot dock on Flathead River, and on Swan River is less than five (5) feet, additional length may be allowed if the dock cannot be moved laterally to achieve the five (5) foot depth.

c.  The maximum length of the wing section on a dock, whether a T, F, 4 or L shaped dock, must not exceed the lesser of thirty (30) feet or thirty (30) percent of the lot frontage (See Figure 2. Dock Dimensions in Adopted Rules).

d.  The width of the deck on a dock must not be greater than six (6) feet, except on a floating dock, width may be increased to eight (8) feet for greater stability.

e.  If foam or similar easily damaged flotation systems are incorporated into the dock design, the material must be completely encased in solid wood or a suitable impervious, non-corrosive material such as aluminum or galvanized sheet metal so as to avoid the breakup or scattering of materials. Plywood, particle board, etc., must not be used. Boards may be spaced up to one-half inch apart on the bottom or drain holes may be incorporated into other materials to aid in drainage.

f.  All floating docks must be suitably anchored to the river bottom or bank to avoid drift. Anchoring methods are limited to cable; galvanized chain or nylon or polypropylene rope attached to a suitable clean weight such as solid clean concrete, rock or steel blocks or a temporary pipe and post system which allows the dock sections to slide up and down. In addition, the end of the floating dock may be secured by cable, anchor, or post to keep the end of the dock stable.

g.  Only one (1) dock is allowed per waterfront property ownership. This includes multiple contiguous lots under one family or related ownership, unless an individual dwelling or condominium type structure is constructed on each separate and legally defined lot, in which case more than one (1) dock may be allowed.

h.  Docks which have deteriorated to the extent that they could contaminate the river, such as having exposed white Styrofoam, must be immediately repaired to eliminate the risk of contamination or must be removed entirely from the water.

i.  It is a violation of these regulations to abandon docks or to otherwise allow docks or dock remnants to float out into the river unsecured.

j.  Floating docks should be removed from the water by December 1 and

Exhibit 5
Page 34 of 40

anchored securely above the high water line.

I. **DREDGE, FILLING, AND SWIM BEACH CREATION**

  1. **Findings**

    a.    In determining a reasonable means of dredging, consideration must be given to the fact that dredging of a streambed or bank could have adverse effects due to suspension of fine materials, re-suspension of nutrients and toxic materials, exposure of stable streambed sediments to unstable conditions, removal of stream bed armament and creation of steep bench areas.

    b.    Filling of wetlands creates adverse effects due to destruction of the aquatic environment, loss of habitat for fish and aquatic wildlife, loss of water storage capacity, loss of the natural storm runoff cleansing functions, and the loss of natural nutrient entrapment functions of wetlands.

    c.    Cutthroat and Rainbow trout spawning takes place in April and May and the fry emerge from the gravel from mid-June to mid-July. Brook and Bull trout spawn from mid-September to the end of November and the fry emerge from the gravel in March and April.

  2. **Standards**

    a.    The streambanks must not be undercut or damaged.

    b.    Stream bank vegetation must not be damaged.

    c.    Fuel or lubricants must not be allowed to enter the stream; if this happens all operations are to be stopped and remedial efforts are to begin immediately.

    d.    The dredge must only be operated during daylight hours unless authorized.

    e.    Dredging and/or filling is only permitted at the time of year specified on the permit. The dredge must only be operated between July 15 and September 15 to protect the fish that are developing in the gravels.

    f.    Discharge of fill material into the stream may be prohibited.

    g.    If allowed, dredged areas must be stabilized with a protective armament as soon as possible after excavation. In areas where there is a rock layer on the surface of the streambed or bank, such rock may be removed and set aside, but then must be replaced as a protective layer subsequent to the excavation.

    h.    Dredging for the purpose of creating, enlarging, or improving an artificial harbor, lagoon, or in-stream pond is prohibited.

    i.    Filling for the purpose of expanding existing land areas is prohibited.

    j.    Filling of wetlands is prohibited.

    k.    Filling for the purpose of creating a swimming beach may be allowed. All fill must be clean, washed material, free of silt or clays.

    1.    If dredging outside the wetted channel, effluent from the dredge must be run over a gravel bar or through a settling pond to remove suspended solids.

    m.    Pits created by dredging must be filled at the conclusion of the operation.

J. **DWELLING UNITS**

  1. **Findings**

Buildings represent concentrations of human activities. Such activities are essentially land based with people entering the aquatic environment only for relatively short periods of time for recreational purposes. Buildings are potentially harmful through creation of impervious surfaces, increasing surface storm runoff into the stream and possible sewer leakage.

Exhibit 5
Page 35 of 40

2. **Standards**
Buildings or portions thereof, over the bed or immediate banks of a stream, are prohibited. This includes roof overhangs, drip lines, balconies, bay windows, and chimneys. The district recommends structures be set at least twenty (20) feet back from the immediate (highest) bank of the stream (not the high water mark).

K. **FENCES**
   1. **Findings**
      a. Fences along streams restrict livestock and equipment movement near the stream, thereby minimizing bank damage and preserving water quality.
      b. If streams, ponds and wetlands are fenced, livestock can obtain water from fenced stream crossings and access ramps, and troughs to which water is diverted. Water Gaps (breaks in the fence where livestock can access the stream) provide access to required water while limiting streambank disturbance to a small portion of the stream. Providing stable access points with rock, gravel, or geoweb matting will encourage livestock to use the area, while reducing soil erosion.
      c. Fences across streams are a navigational hazard, alter stream currents, and trap debris.

   2. **Standards**
      a. Install pasture gates away from riparian areas, unless the gate is to access a fenced riparian area.
      b. Livestock watering access approaches must have gradual ascent and descent grades and be of suitable material to withstand repeated and long term use.
      c. Cross-stream fencing must be accomplished with breakaway wire, swinging floodgates, hanging electrified chain or other devices to allow the passage of floodwater debris during high flows.

L. **FISH PASSAGE AT ROAD CROSSINGS**
   1. **Findings**
      a. Road crossings may create adverse hydrologic conditions, high velocities, turbulence, and inadequate depths that prevent fish from moving upstream.
      b. Preventing fish passage blocks spawning migrations and use of upstream habitats, negatively impacting juvenile and adult fish.
      c. Projects that permanently prevent fish migration are prohibited. Rule 12.10. Project Construction in Adopted Rules.
      d. There are many factors which affect fish passage. Each site is unique and therefore requirements for fish passage may vary.

   2. **Standards**
      a. In determining a reasonable means of constructing a fish passage, consideration must be given to the uniqueness of the site, fish species, size and age of fish, discharge and gradient of the stream, size and type of a fish passage, such as a culvert, and inlet and outlet conditions that prohibit using a single set of specifications to assure passage.
      b. Bridges are the best structures in providing fish passage, followed by bottomless culverts, imbedded culverts, and non-embedded culverts in descending order of their ability to pass fish. Dependent on site characteristics, a non-embedded

Exhibit 5
Page 36 of 40

round culvert may not provide passage and one of the above options may be required.

    c.    Place culvert on the grade of the stream.  Locate the culvert in a straight reach so it does not direct flow against the bank.  Do not perch or bury culvert ends.

    d.    If possible, oversize the culvert to accommodate partial filling with streambed material and set the culvert below the level of the bed.  On small streams, culvert width should be equal to or greater than the average bank full channel width to reduce velocities in the culvert during high flows.

**M.**    **FUEL TANKS**

    1.  **Findings**

        a.    Fuel spills into the stream seriously effect water quality, and impair fish and aquatic habitat.

        b.    In determining a reasonable means of constructing fuel tanks, consideration must be given to the prevention of fuel spills and leakages.

    2.  **Standards**

        a.    Bulk fuel tanks must not be placed over or under a stream or its immediate banks.

        b.    If a tank is located near a stream and the line goes under, through, or over a stream, a pressure shut-off valve must be located next to the bulk tank on the line, between the tank and the stream.

**N.**    **MARINAS**

    1.  **Findings**

        a.    A marina, because of its size, has a high potential to impact the stream and the streambank.

        b.    Water quality is an important factor in the permitting of a marina.

        c.    Fish and aquatic habitat is an important factor in the permitting of a marina.

        d.    It is recognized that navigation can be affected by the permitting of a marina.

        e.    It is recognized that safety of neighboring landowners and recreational users of the stream can be affected by the permitting of a marina.

        f.    In determining a reasonable means of constructing a marina, consideration must be given to current, water depth, stream width, stream configuration, soils, and bank configuration.

    2.  **Standards**

        a.    The following may be considered:

            i.    Current;

            ii.    Water depth;

            iii.    Stream width;

            iv.    Stream configuration;

            v.    Soils;

            vi.    Bank Configuration; and

            vii.    The design of the marina and its docks must accommodate the anticipated sizing and capacity needs of the proposed project.

        b.    The streambed and bank must not be excavated or dredged in order to provide channels and suitable water depth for boating access into the

Exhibit 5
Page 37 of 40

marina.

O.   **PONDS**
1. **Findings**
    a.   In-stream ponds change streambanks and stream hydrology, which can cause erosion and adversely affect water quality, aquatic habitat, and fish populations.
    b.   Off-stream ponds that discharge back to streams can cause adverse/harmful stream channel changes.
    c.   Off-stream ponds that discharge back to streams can raise water temperature and cause other adverse water quality changes.
    d.   Fish migrate from an off-stream pond that is connected to a stream, which can cause adverse impacts to fish and aquatic habitat.

2. **Standards**
    a.   In-stream ponds are prohibited.
    b.   Off-stream ponds that are connected to a natural stream channel are discouraged.
    c.   Diversion to and from an off-stream pond must be connected to the stream by means of a buried pipeline fitted with inlet and outlet controls.

P.   **SANDBAG PROJECTS**
1. **Findings**
The placement and the removal of sandbags on the immediate banks of a perennial-flowing stream or river is an activity that may result in a change of the state of a stream. Sandbagging in or near a stream is usually associated with flooding and is meant to be a temporary remedy for the protection of life and property.

2. **Standards**
    a.   Sandbagging on the bed or immediate banks of a stream is a project requiring a 310 permit.
    b.   If sandbagging is to be undertaken prior to the threat of high water, a 310 permit is required.
    c.   A plan of operation may be submitted pursuant to Rule 9.3.b. Notice of Proposed Project/Permit Application in Adopted Rules, if sandbagging is to be conducted annually.
    d.   Description of the placement of the sandbags, length of project, distance from riverbed, height of project, and plan for the removal of the sandbags after the high water subsides, are required.
    e.   In an emergency, as defined under Rule 4.18. Definitions in Adopted Rules, the emergency procedure set forth in Rule 15 Emergencies in Adopted Rules, must be followed.
    f.   A person sandbagging on the bed or immediate banks of a stream, during an emergency, shall notify the district in writing within fifteen (15) days of the action taken, on Form 275.
    g.   A person who fails to submit either a 310 application or an emergency notice is in violation of the 310 Law and is subject to the penalties provided in 75-7-123, MCA.

---

310-Permit Application #FL2019005, Unnamed, GNP                               FCD 12/2017

Exhibit 5
Page 38 of 40

**Q.** **UTILITY LINES (ELECTRICAL, SEWER LINES – DISPOSAL FACILITIES,**
**UTILITY LINE BURIAL – BORING - TRENCHING, WATERLINES, WELLS AND CISTERNS)**

1. **Findings**
   a. The improper placement of wells and utility lines has significant effects on streams due to disturbances of streambeds and banks.
   b. In determining a reasonable means for development of utility lines, consideration must be given to the prevention of leakage, spillage, flotation or snagging, flow of salt laden water into a stream, and the maintenance of the streambed and bank to as near its prior condition as possible.

2. **Standards**
   a. **Sewer lines/Disposal facilities:**
      Streamside sewage pump out facilities may be placed in public or private marinas or public parks.
      i. Such facilities must include equipment to pump or otherwise receive and transfer contents of vessel holding tanks into a sewage retention and/or disposal system located outside the flood plain.
      ii. Such facilities must include in the design appropriate plans to prevent all spillage or leakage from entering the stream.

   b.  **Utility Line Burial:**
      i. **Boring**
         1. The proposed activity may be determined by the board, after reviewing the application, to not be a project requiring a permit if utility line boring takes place a minimum of twenty (20) feet away from the top of the highest bench of the bank, and takes place a minimum of five (5) feet below the lowest part of the stream.
         2. No discharged material from the drilling process can enter into the stream and its' immediate banks.
         3. This rule can only be used if the Flathead Conservation District office is notified ten (10) days before the proposed project is to begin and standards i.1. and i.2. are met.

      ii. **Trenching**
         1. Only the minimum amount of material necessary to lay the line can be removed from the trench.
         2. All material excavated from the trench must be replaced back into the trench as backfill. Any material that is not replaced back into the trench must be completely removed from the floodplain.
         3. In areas where there is a rock layer on the surface of the stream bed or bank, such rock must be removed and set aside, then replaced as a protective layer subsequent to the excavation.
         4. In areas where no rock layer exists, the replaced dirt must be compacted and consolidated in order to prevent erosion.

Exhibit 5
Page 39 of 40

     Additional cover, such as gravel, a rock layer or vegetation, may also be required.

  5. Following installation, the streambed or bank must be returned to its condition prior to construction, and/or revegetated.

c. **Waterlines**:
That portion of the waterline that is not buried and does lie exposed on the bottom of the streambed or bank must be weighted to prevent flotation or snagging.

d. **Wells and Cisterns**:
  i. A well or cistern must not be drilled or developed in the stream.
  ii. For wells or cisterns located on the immediate bank of a stream, when originally developing and pumping the well, the silt laden water must not be allowed to flow into the stream.

Exhibit 5
Page 40 of 40